CITIZENS FIRST NATIONAL
BANK, Appellee,

v.

Millard L. HOYT, M.D., Appellant,

and

Paul V. Koffman, Defendant.

No. 63297.

Supreme Court of Iowa.

Oct. 15, 1980.

Rehearing Denied Nov. 6, 1980.

John A. Pabst of Pabst & Pabst, Albia, for appellant.

John P. Duffy of Connell & Duffy, Storm Lake, for appellee.

ALLBEE, Justice.

Defendant Millard L. Hoyt appeals from adverse judgments awarded to plaintiff Citizens First National Bank on Hoyt's promissory note, and to defendant Paul V. Koffman on his cross–petition against Hoyt. Two separate written agreements underlie the matters in controversy. The first, a farm management agreement effective November 1, 1971, was between the bank and Hoyt. By this agreement the bank was to undertake the management of certain of Hoyt's properties in Iowa. Following execution of the management agreement, Hoyt borrowed $25,000 from the bank to purchase cattle in which the bank perfected a purchase money security interest. The second agreement, a maintenance agreement entered into in the fall of 1973, was between the bank, acting as Hoyt's agent, and defendant Koffman. This agreement provided for Koffman to keep and care for a cattle herd owned by Hoyt and managed by the bank; it required Koffman to provide care for the cattle in accord with the accepted practices in the "best cow–calf operations." Both the management agreement and the maintenance agreement were to run from year to year unless either party notified the other on or before September 1 of their intention to terminate the agreement, in which case the agreement would expire on the following November 1.

The bank terminated its management agreement with Hoyt by notice mailed on August 27, 1974. While Hoyt did not timely act to terminate the maintenance agreement, early in 1975 he did attempt to renegotiate the contract to provide for less compensation for Koffman. These negotiations failed, the cattle remained with Koffman, but Hoyt did not pay Koffman the fees required by the maintenance agreement.

On October 30, 1975, Koffman gave notice of the proposed sale of the cattle to satisfy his agistor's lien. See ch. 579, The Code. Hoyt obtained temporary enjoinment of the sale in order to challenge the validity of the lien. Shortly thereafter, the lien's validity was upheld, the temporary injunction dissolved and on December 5 the cattle were sold at auction. The sale netted proceeds in the amount of $22,038.35, which were placed on deposit in escrow at a bank in Oskaloosa.

The plaintiff bank commenced the present action in January 1976 for judgment on Hoyt's renewed and overdue $25,000 promissory note, bearing the date January 7, 1975 and due December 1. The bank, having also joined Koffman as a defendant, asked that its security interest be confirmed as against Koffman's claim to the proceeds of the sale of the cattle, that those proceeds be applied in partial satisfaction of the bank's judgment and that execution issue against Hoyt for the deficiency. Koffman filed a cross–petition alleging that Hoyt owed him $16,618.25 for the care of Hoyt's cattle. In response to the claims of the bank and Koffman, Hoyt asserted a series of counterclaims, setoffs and affirmative defenses.

After an extended trial, on September 23, 1977, the trial court filed abbreviated findings and conclusions in which it determined that the bank and Koffman had established their respective claims and that there was "no competent or credible proof" to support Hoyt's various counter assertions. Hoyt then filed a timely motion, under Iowa R.Civ.P. 179(b), asking the court to enlarge or amend its findings and conclusions. This motion consisted of sixty–seven numbered paragraphs, some of which contained several sub–paragraphs. Hoyt also moved for a new trial. Both motions were summarily overruled, and Hoyt appealed.

In an unpublished opinion filed October 18, 1978, this court reversed and remanded the case with directions that it be resubmitted on the record originally made for rendition of new findings of fact, conclusions of law and judgment.

This was done because the trial court's meager findings and conclusions, coupled with its summary disposition of Hoyt's rule 179(b) motion, did not provide an adequate record for appellate review, leaving us unable to pass upon the issues presented without assuming the function of the trial court.

Because the district judge who originally tried this case had since retired, resubmission was undertaken by Judge James D. Jenkins, who was serving in Monroe County when the procedendo and the original papers and exhibits were received by the county clerk. On January 11, 1979, Judge Jenkins filed comprehensive findings of fact and conclusions of law which were also in favor of both the bank and Koffman. Hoyt's subsequent motion for a new trial was overruled, and this appeal followed.

In this appeal, Hoyt asserts that (1) the bank's cancellation of the management agreement constituted a breach of its fiduciary duties to him; (2) this action by the bank on the promissory note is barred by estoppel, laches and waiver; (3) the loan from the bank evidenced by the promissory note was a consumer credit transaction, and the bank by its legal action and conduct violated the Iowa Consumer Credit Code; (4) the cross–petition of Koffman is barred by the doctrines of res judicata and/or issue preclusion; (5) he should have been awarded damages for mental distress; (6) he is entitled to be indemnified by the bank for the judgment in favor of Koffman; (7) trial court erred in not granting him a new trial on grounds that Judge Jenkins should have disqualified himself from deciding this cause; (8) Koffman failed to provide notice of the sale of the cattle under the agistor's lien, thereby invalidating the sale; (9) Koffman breached the maintenance agreement.

■ We have closely examined each of Hoyt's assigned errors, mindful that in this law action trial court's findings of fact have the force of a special verdict, Iowa R.App.P. 4, and are binding on us if supported by substantial evidence, Iowa R.App.P. 14(f)(1). We are unable to find reversible error in any of Hoyt's assignments, and our opinion will address only the third and seventh assignments.

I. As stated above, Hoyt contends that the loan from the bank, evidenced by the $25,000 promissory note of January 7, 1975, constituted a consumer credit transaction. Consequently, he argues, certain actions on the part of the bank were violative of the Iowa Consumer Credit Code (ICCC), chapter 537, The Code 1975. Specifically, he alleges that the bank failed to provide notice of his right to cure default as per the format in section 537.5111, sent to him for his signature an authorization to confess judgment in violation of section 537.3306 and engaged in misrepresentations concerning his debt and in other "unfair collection practices" prohibited by subsections 537.-7103(4)(e) and (5)(e).

■ Trial court held that the loan was not a consumer credit transaction, and that accordingly the provisions of the ICCC were not applicable. Trial court predicated its determination upon the premise that the transaction which culminated in the promissory note lacked the statutorily required attributes of a consumer credit transaction. See §§ 537.1301(11)–(13), (15)(a). However, in *First Northwestern National Bank v. Crouch*, 287 N.W.2d 151 (Iowa 1980), filed subsequent to trial court's decision in this case, this court held that a transaction otherwise lacking in the definitional attributes of a consumer credit transaction may nonetheless be governed by the ICCC where the parties have contracted to make the transaction subject to the coverage of that code. That is precisely the situation before us.

The promissory note executed by Hoyt, like the note in *Crouch*, included the language "This loan is subject to the provisions of the Iowa Consumer Credit Code applying to consumer loans" and "THIS IS A CONSUMER CREDIT TRANSACTION." In *Crouch*, we held that where a promissory note on its face provides that it is subject to the provisions of the ICCC, it will be assumed the parties intended that that code govern the transaction, at least in the absence of admissible evidence to the contrary. *Crouch*, 287 N.W.2d at 153. As in

*Crouch,* while the transaction here arguably lacks all the characteristics statutorily required of a consumer credit transaction, *see* §§ 537.1301(4), (15), there is no evidence that, despite the language employed on the face of the note, the parties did not intend that the provisions of the ICCC should govern. Consequently, *Crouch* dictates that we find that the transaction falls within the purview of that code.

■ Trial court's erroneous conclusion with respect to the inapplicability of the ICCC does not, however, require that we disturb its judgment, because we are satisfied that it nevertheless did reach the correct result. *See Schnabel v. Vaughn,* 258 Iowa 839, 845, 140 N.W.2d 168, 172 (1966). Under the record before us, we conclude that the bank did not violate any provision of the ICCC in bringing this action against Hoyt, and hence was entitled to judgment on the promissory note and the other relief granted. We are obliged to affirm an appeal where any proper basis appears for a trial court's ruling, even though it is not one upon which the court based its holding. *General Motors Acceptance Corp. v. Keil,* 176 N.W.2d 837, 841–42 (Iowa 1970). Thus under this assignment of error, although trial court was incorrect in holding the ICCC inapplicable, unless the bank violated that code in one or more of the respects charged by Hoyt, it was entitled to judgment in the present action. We now explain our resolution of the specific violations alleged by Hoyt.

■ Section 537.5111, which covers the notice of right to cure to be afforded a debtor in default on a consumer credit transaction, provides in pertinent part as follows:

1. The notice of right to cure shall be in writing and shall conspicuously state the name, address, and telephone number of the creditor to which payment is to be made, a brief identification of the credit transaction and of the consumer's right to cure the default, a statement of the nature of the right to cure the default, a statement of the nature of the alleged default, a statement of the total pay-

ment, including an itemization of any delinquency or deferral charges, or other performance necessary to cure the alleged default, and the exact date by which the amount must be paid or performance tendered.

Hoyt contends that he was not given notice to cure pursuant to this statutory mandate. It is undisputed, however, that the bank on December 9, 1975, sent a letter to Hoyt informing him that legal action would be taken in the event his then past–due obligation were not satisfied. That letter, placed in evidence by Hoyt, satisfied each of the requirements of the above–quoted statutory provision, with the exception of the inclusion of the bank's telephone number.

At this juncture, we note that the Official Comment to that section of the Uniform Consumer Credit Code to which section 537.5111 corresponds states, *inter alia,* the following with respect to the notice of right to cure: "The notice is calculated to give the consumer enough information to understand his predicament and to encourage him to take appropriate steps to alleviate it." Uniform Consumer Credit Code § 5.110, comment 1 (1974 Act). With this purpose in mind, we again look to the circumstances of this case.

Hoyt's own evidence shows that he was in regular contact with the bank both prior and subsequent to the letter of December 9, 1975; this amply demonstrates that he knew how to reach the bank. In light of these circumstances, the absence of the bank's telephone number in the letter could not have prejudiced Hoyt. *See Lloyd's Plan, Inc. v. Brown,* 268 N.W.2d 192, 195 (Iowa 1978). Thus it is clear that in this case the bank's December 9 letter to Hoyt fulfilled the basic purpose of the notice to cure–"to give the consumer enough information to understand his predicament and to encourage him to take appropriate steps to alleviate it"–despite the absence of the bank's telephone number. By our holding here we do not, however, condone the utilization by creditors of "notices" which differ in any substantial degree from the format provided by section 537.5111(2).

Hoyt next alleges that the bank violated section 537.3306, which prohibits the utilization of an authorization to confess judgment by a creditor, "[u]nless executed after default . . . ." Here, the documents authorizing a confession of judgment were sent to Hoyt after the default on the promissory note. Thus, according to the plain language of the statute, this action by the bank did not constitute a violation of the ICCC.

With respect to the misrepresentations and other "unfair collection practices" alleged by Hoyt, the record is void of any factual basis which would support a finding that the conduct of the bank was violative.

Under the record in this case, Hoyt's third assignment of error does not require reversal of the judgment entered by trial court.

II. In his seventh assignment of error, Hoyt argues that his second motion for a new trial should have been granted on the ground that the judge who presided over the resubmission of the case was disqualified by reason of Canon 3C(1)(d)(II), Iowa Code of Judicial Conduct, and section 605.17, The Code 1979. Under the facts peculiar to this case, we are satisfied that trial court did not err in denying Hoyt's motion.

Canon 3C provides in relevant part as follows:

(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

.      .      .

(d) he or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person;

.      .      .

(II) is acting as a lawyer in the proceeding;

.      .      .      .      .

In a situation where a relationship of the type specified in the canon is present, disqualification of a judge will ordinarily be automatic, see E. Thode, *Reporter's Notes*

*to Code of Judicial Conduct* 67 (1973), and should be on the judge's own initiative. However, the Iowa Code of Judicial Conduct does provide for the waiver of disqualification under Canon 3C(1)(d) where there has been a disclosure of the relationship and a written agreement by the parties and lawyers involved that it is immaterial. Canon 3D, Iowa Code of Judicial Conduct.

Here, the judge who considered the case after our remand was related to Hoyt's attorneys by affinity in the third degree and consanguinity in the fourth degree, respectively. Hoyt now argues that because there was no disclosure of this relationship on the record and no written agreement by the parties and counsel with respect thereto, there was no waiver of disqualification and therefore denial of the motion for a new trial was error. Implicit in this argument is the contention that absent adherence to the procedure delineated in Canon 3D, there can be no waiver of judicial disqualification. We cannot agree that this provision supplies the only means of waiving the disqualification of a judge. Rather, we believe that waiver in this context may be effected not only be express agreement, but also impliedly, "by proceeding without objection with the trial of the case with knowledge of the disqualification." *Haire v. Cook*, 237 Ga. 639, 642, 229 S.E.2d 436, 438–39 (1976) (quoting *Georgia Power Co. v. Watts*, 184 Ga. 135, 144, 190 S.E. 654, 660 (1937)).

It is obvious that Hoyt's attorneys were well aware of the relationship between themselves and Judge Jenkins prior to his consideration of the case after remand; one of the attorneys is the judge's uncle and the other his first cousin. Further, there is no showing of any attempt on their part to recuse the judge before or during his review on the record. Rather, the issue of disqualification was raised only after judgment had again been entered against Hoyt. Moreover, the unchallenged record reveals that prior to Judge Jenkins's consideration of this case, he had acted as trial judge in other cases involving one or the other of Hoyt's attorneys, and his qualifications

based upon his relationship to those attorneys were not questioned. Finally, it is clear that Hoyt's attorneys were aware well in advance of the time that Judge Jenkins filed his findings of fact and conclusions of law that he had undertaken consideration of this case, and there was never any suggestion that he should disqualify himself because of his relationship to them. Under these circumstances, disqualification under Canon 3C(1)(d)(II) was waived.

Consideration of Hoyt's argument concerning disqualification under section 605.-17, The Code 1979, leads to the same conclusion. That section provides that a judge shall be disqualified "except by mutual consent of the parties" where he "is related to either *party* by consanguinity or affinity within the fourth degree . . . ." (Emphasis added.) Even assuming that attorneys were intended to be included within the relationship proscription of this provision, it is clear that under the circumstances of this case, any challenge based upon disqualification was waived. Previous decisions indicate that "consent" may be inferred where the parties are aware of the relationship and nonetheless proceed without objection. *Incorporated Town of Dows v. DeLong*, 149 Iowa 251, 254, 128 N.W. 341, 342 (1910); *Stone v. Marion County*, 78 Iowa 14, 15–17, 42 N.W. 570, 571 (1889); *see In re Estate of Hale*, 231 Iowa 1018, 1020–22, 2 N.W.2d 775, 777–78 (1942).

In any situation in which his impartiality might reasonably be questioned, a judge should ordinarily disqualify himself. Thus, but for the exceptional circumstances presented in this case, Judge Jenkins would have been obligated to recuse himself under Canon 3C(1)(d)(II), Iowa Code of Judicial Conduct.

Having found no reversible error, trial court's judgment is affirmed.

AFFIRMED.

All Justices concur except McGIVERIN and SCHULTZ, JJ., who take no part.