STATE of Iowa, Appellee,

v.

Sherryl Ann SNODGRASS, Appellant.

No. 69109.

Supreme Court of Iowa.

March 14, 1984.

Michael G. Shepherd and G. Gregory Kelly, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., Teresa Baustian, James W. Ramey, and Selwyn Dallyn, Asst. Attys. Gen., and Thomas F. Kintigh, County Atty., for appellee.

McGIVERIN, Justice.

Defendant Sherryl Ann Snodgrass and Michael L. Hood were jointly charged, tried, and convicted of first-degree murder in violation of Iowa Code sections 707.1–.2 (1981) for the death of defendant's husband, Gregory Snodgrass. Defendant raises several grounds of prejudice that al-

legedly resulted from her joint trial with codefendant Hood—principally that she was prejudiced by Hood's alleged antagonistic defense. We affirm. This is a companion case of *State v. Hood,* 346 N.W.2d 481 (Iowa 1984), which we also file today.

The shooting death of Gregory Snodgrass occurred on September 20, 1981. Prior to that time, defendant, who was estranged from her husband, had become involved in an amatory relationship with Hood. On September 20, she drove with her three children and Hood from Missouri to her farmhouse near Ottumwa. Defendant testified she intended to pick up her children's clothes and then return to Missouri to live.

They travelled to Iowa with three loaded guns—a .30 caliber carbine, a 16-gauge sawed-off shotgun, and a .357 revolver. According to defendant, she did not believe the presence of the weapons was unusual because Hood usually carried guns. She said Hood told her he intended to sell the guns after they returned from Iowa. The 16-gauge shotgun was found to have been the weapon that killed defendant's husband.

When they arrived near the farmhouse, according to trial testimony, defendant asked Hood to stay away from the house. At first he did, waiting in a nearby field as defendant went into the house. Defendant's husband arrived later and an argument developed after defendant told him she was leaving. Hood, who had been waiting in the field for more than two hours, then approached the house and heard arguing and the sound of slapping. He entered the house through the back door and into the kitchen. Hood testified he was then unarmed; defendant testified she did not then see him carrying a gun.

At this point, according to trial testimony, the stories of defendant and Hood diverge as to the events leading up to and culminating in the fatal shooting of Gregory Snodgrass. According to defendant, she, Gregory, and Hood began arguing. Defendant then went to the bedroom to

quiet the children. While in the bedroom, she heard her husband go to the hall closet where his 12-gauge shotgun was kept. She heard a shot and someone yell. She testified she remained in the bedroom because she was numb and scared. After some time the telephone rang and Hood came to the bedroom door and told her to open it. She said Hood told her to answer the phone, that it was probably neighbors who heard the gun go off.

She did answer the phone. The caller was Hood's mother and, at Hood's direction, defendant talked with her, denying Hood's presence there. It was after this, according to defendant, that she learned from Hood that he had shot her husband. When defendant picked up the phone to call for help, Hood told her that her husband was dead. Hood also told her they couldn't call the police because he violated parole for even coming to Iowa.

According to Hood's trial testimony, when he entered the farmhouse Gregory Snodgrass was standing by the entry from the kitchen to the living room. Defendant, according to Hood, did not go into the bedroom but remained beside the dishwasher in the kitchen. Gregory was armed with a shotgun and saw Hood enter. Hood claims to have frozen; he testified he merely stood there unarmed. He said he heard a gun discharge and saw Gregory was wounded in the chest. He testified he did not actually see defendant shoot her husband but did see her with a shotgun in her hand after the shooting. Defendant then ran to the bedroom where the children were.

Wounded, Gregory walked around the kitchen. Hood claims to have still feared for his own safety, and so stabbed Gregory. He stabbed Gregory three times, once in the head, and, as Gregory turned away, twice in the back.

Forensic evidence showed that Gregory had to be standing in the doorway area between the kitchen and living room when he was shot. The shooter had to be standing between Gregory and the west wall of the living room.

Following the shooting, defendant and Hood cleaned the premises and wiped off fingerprints. Hood then put the body in the trunk of the Snodgrass car. Hood, Snodgrass, and the children then drove to Missouri. With the help of some fellow Ku Klux Klan members, Hood subsequently dumped the body into the Mississippi River.

For the next few days defendant and Hood stayed at various hotels and Hood laid out the story they were to tell police. The record is unclear about the details but apparently Hood instructed defendant to tell the authorities that she saw her husband and Hood fighting over a knife and saw her husband get his shotgun out of the closet. Hood was to claim he shot Gregory in self-defense.

On September 25, defendant and Hood turned themselves in to a Missouri sheriff. They both gave taped oral statements. Defendant's statement was consistent with her trial testimony. Hood's was not; at that time Hood's story was consistent with defendant's. Prior to trial, however, Hood was no longer verifying defendant's version of the events. In support of motions by both defendants to separate the trial it was pointed out that their testimony would be hostile to each other.

The State's theory, and there was evidence from which it could readily be derived, was that defendants acted jointly in planning the murder and disposing of the body.

Both defendants attempted to exculpate themselves to some extent by inculpating the other. They each contended that the other shot the victim. However, they both asserted, in agreement, that the shooting was either in self-defense or in defense of a third person, and thus was a justifiable killing under Iowa Code section 704.3. Defendant and Hood made objections during trial that the trial of each should be severed from their joint trial due to the conflicting accounts of the shooting which they alleged amounted to antagonistic defenses. The jury found both defendant and Hood guilty of first-degree murder.

Snodgrass asserts several grounds of prejudice that allegedly resulted from her joint trial with codefendant Hood.

The main question is whether the trial court abused its discretion under Iowa R.Crim.P. 6(4)(b) in refusing to sever the trial of the codefendants, thereby resulting in a denial of defendant's due process rights to a fair trial. Her principal contention on that question is that she was prejudiced by Hood's alleged antagonistic defense. She also asserts several additional grounds of claimed specific prejudice that arose during the joint trial.

I. *Allowance of joint trials.* Iowa R.Crim.P. 6(4)(b) (1982)[1] in effect at the time of trial provides:

When an indictment charges a defendant with a felony, and the same indictment charges two or more defendants, those defendants jointly charged may be tried jointly, if in the *discretion* of the court a joint trial will not result in *prejudice* to one or more of the parties; otherwise the defendant shall be tried separately. Where jointly tried, each defendant shall be judged separately on each count.

(Emphasis added.)

 We interpreted rule 6(4)(b) in *State v. Belieu,* 288 N.W.2d 895 (Iowa 1980). We noted that rule 6(4)(b) vests the decision of a motion to sever in the discretion of the trial court and that when a trial court denies severance in the exercise of its discretion, the ruling will be reversed on appeal only if the defendant demonstrates an *abuse of discretion. Id.* at 900. To establish an abuse of discretion, the defendant must show sufficient prejudice to constitute denial of a fair trial. *Id.* To cause the type of prejudice that prevents codefendants from obtaining a fair trial, the defenses must be more than merely antagonistic, they must conflict to the point of being irreconcilable and mutually exclusive.[2] *United States v. Bovain,* 708 F.2d

606, 610 (11th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 251, 78 L.Ed.2d 238 and *cert. denied,* —— U.S. ——, 104 S.Ct. 497, 78 L.Ed.2d 690 and *cert. denied,* —— U.S. ——, 104 S.Ct. 551, 78 L.Ed.2d 724 (1983); *United States v. Riola,* 694 F.2d 670, 672 (11th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 1532, 75 L.Ed.2d 953 and *cert. denied,* —— U.S. ——, 104 S.Ct. 118, 78 L.Ed.2d 117 (1983); *United States v. Crawford,* 581 F.2d 489, 492 (5th Cir.1978). The test for irreconcilability of defenses has been established in the federal courts as follows:

[T]he defense of a defendant reaches a level of antagonism (with respect to the defense of a co-defendant) that compels severance of that defendant, if the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant.... Where two defendants present defenses that are antagonistic at their core, a substantial possibility exists " 'that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.' " If the essence of one defendant's defense is contradicted by a co-defendant's defense, then the latter defense can be said to "preempt" the former. This sort of conflict between defendants creates the compelling prejudice that mandates severance.

*United States v. Berkowitz,* 662 F.2d 1127, 1134 (5th Cir.1981) (citations omitted).

 It is well established, however, that the mere presence of conflict, antagonism or hostility among defendants or the desire of one to exculpate himself by inculpating another are insufficient grounds to require separate trials. *State v. Belieu,* 288 N.W.2d at 900; *see also United States v. Arruda,* 715 F.2d 671, 679 (1st Cir.1983) ("The law in this circuit is well settled; 'antagonistic defenses do not per se require

---

1. Subsequently amended by 1982 Iowa Acts ch. 1269, effective July 1, 1982. However, the amended rule does not apply here.

2. Federal court decisions which construe and apply Fed.R.Crim.P. 14, which is similar to Iowa

R.Crim.P. 6(4)(b), are persuasive although not conclusive authority for construction and application of rule 6(4)(b). *State v. Belieu,* 288 N.W.2d at 897.

severance, even if the defendants are *hostile* or *attempt to cast the blame on each other.*' ") (quoting *United States v. Talavera,* 668 F.2d 625, 630 (1st Cir.1982)) (emphasis added); *United States v. Madison,* 689 F.2d 1300, 1305 (7th Cir.1982) ("The mere presence of *hostility* among defendants *or the desire of one to exculpate himself by inculpating another* are *insufficient grounds to require separate trials.*") (emphasis added), *cert. denied,* —— U.S. ——, 103 S.Ct. 754, 74 L.Ed.2d 971 (1983); *United States v. Calabrese,* 645 F.2d 1379, 1384 (10th Cir.) ("One defendant's attempt to cast blame on the other is not in itself a sufficient reason to require separate trials."), *cert. denied,* 451 U.S. 1018, 101 S.Ct. 3008, 69 L.Ed.2d 390 and *cert. denied,* 454 U.S. 831, 102 S.Ct. 127, 70 L.Ed.2d 108 (1981); *United States v. Boyd,* 610 F.2d 521 (8th Cir.1979) ("The mere fact that there is *hostility* among the defendants, *or one defendant may try to save himself at the expense of another* is not sufficient grounds to require separate trials.") (emphasis added), *cert. denied,* 444 U.S. 1089, 100 S.Ct. 1052, 62 L.Ed.2d 777 (1980); *United States v. Brady,* 579 F.2d 1121, 1128 (9th Cir.1978) ("Conflicting and antagonistic defenses being offered at trial do not necessarily require granting a severance, even if *hostility* surfaces or *defendants seek to blame one another.*") (emphasis added), *cert. denied,* 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979); *United States v. Haldeman,* 559 F.2d 31, 71 (D.C. Cir.1976) (" '[T]he mere presence of *hostility* among defendants *or the desire of one to exculpate himself by inculpating another* have both been held to be *insufficient grounds to require separate trials.*' ") (emphasis added), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). There are many other federal cases with like results and language.

■ II. *No abuse of discretion in trial court's denial of severance motion.* The facts in this case and analogous authority do not support a conclusion that the court abused its discretion in denying defendant's motion to sever her trial and thereby denied her a fair trial.

A. *The facts.* Upon close examination it is clear that the "core" of the codefendants' defenses *were not completely antagonistic* to each other. The core of their defenses, which were included in the instructions to the jury, was that the shooting of Gregory Snodgrass was justified. These defenses were reconcilable with each other.

Snodgrass and her codefendant Michael Hood were indicted jointly and accused of committing the crime of first degree murder. The State's case attempted to establish that both Snodgrass and Hood willfully, deliberately, with premeditation and malice aforethought, killed Gregory Snodgrass. The theory presented by the State was that one of the defendants was directly responsible for the death of the victim and the other defendant was equally culpable for "aiding and abetting" in the killing. Based on this theory, the question of which defendant actually pulled the trigger of the shotgun that directly caused the death of the victim would be irrelevant because the other defendant would also be viewed as committing the act. The jury need only find that one of the defendants pulled the trigger and that the other was knowingly aiding and abetting. Therefore, the argument by each defendant that the other pulled the trigger cannot be considered to be antagonistic defenses because such fingerpointing is not even a defense to the indictment. "[T]hat two defendants may completely disagree on some detail of the facts is not sufficient to compel severance." *Berkowitz,* 662 F.2d at 1134.

The testimony of both defendants supports a finding that their defenses were not completely antagonistic to each other.

Hood testified in substance that when he entered the house unarmed, Gregory Snodgrass aimed a shotgun at him. Hood said he then heard a gun discharge and saw that Gregory was wounded in the chest. Hood said he saw Sherryl Snodgrass with a shotgun in her hands after the shooting. From Sherryl's standpoint, Hood's testimony supported her defense of justification

because any shooting by her of Gregory was done in defense of Hood from imminent use of force by Gregory.

Sherryl testified that she did not see the shooting but that afterward Hood told her that he was not armed when he entered the house and that he only shot Gregory in self-defense. From Hood's standpoint, Sherryl's testimony supported the defense of justification in defending himself against Gregory.

Therefore, the testimony and defenses of both Sherryl and Hood were not so antagonistic to each other as to be irreconcilable. The testimony of Sherryl as to Hood could assist in supporting a not guilty verdict for Hood. The same was true as to Hood's testimony considering Sherryl's actions. Their testimony only differed as to who pulled the trigger that killed Gregory.

Defendants' alleged antagonistic defenses in this case are similar, by analogy, to the defenses offered by the codefendants in *United States v. Sheikh,* 654 F.2d 1057 (5th Cir.1981), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982). In *Sheikh,* codefendants both contended that they had no knowledge that heroin was hidden in a display case that each had possessed. Their argument or defense was that the other was the owner of the case. The court held that the trial court did not abuse its discretion in denying severance because the "essence of the defense of each—the absence of guilty knowledge— was not antagonistic with that of the other" even though with respect to ownership of the case the two arguments were "so antagonistic as to be irreconcilable and mutually exclusive." The court looked to the essence or core of the defenses, notwithstanding the fact that the codefendants' perceptions of factual details were antagonistic.

The "core" of defendants' defenses in this case was justification under Iowa Code section 704.3, notwithstanding the fact that each claimed the other actually pulled the trigger. Both defendants contended that the killing of Gregory Snodgrass was justified by reason of self-defense or defense of

a third person, that is the other codefendant. This is in essence the principal defense they asserted because a finding that one had killed the victim in justification or self-defense would acquit the other as well. This core defense of each defendant, however, was not antagonistic but rather completely harmonious with the identical defense of the other. Each defendant's argument of self-defense would not convict the other but would instead exculpate him or her of any wrongdoing.

The jury was clearly and completely instructed by the court as to the defense of justification asserted by both defendants based on self defense or defense of a third person in the shooting.

In *United States v. Johnson,* 478 F.2d 1129, 1133 (5th Cir.1973), the court stated that "[w]hat constitutes an abuse of discretion depends upon the facts in each particular case." The facts of this case clearly show that defendant was not prejudiced by the trial court's exercise of its discretion in denying her motion to sever her trial from that of her codefendant.

B. *Analogous authority.* Many recent federal cases from several circuits likewise have found no abuse of discretion by the trial court in refusing to grant severance of trial when codefendants alleged antagonistic defenses. *United States v. Walker,* 720 F.2d 1527 (11th Cir.1983); *United States v. Arruda,* 715 F.2d 671, 679 (1st Cir.1983) (codefendant attempted to save himself by implicating the defendant and the court said this amounted to nothing more than "fingerpointing and tattling which does not justify severance."); *United States v. Shively,* 715 F.2d 260 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984); *United States v. Graziano,* 710 F.2d 691 (11th Cir.1983); *United States v. Bovain,* 708 F.2d 606 (11th Cir.) (codefendants attempted to malign each other by eliciting inculpatory information about the other from the key witness at trial), *cert. denied,* —— U.S. ——, 104 S.Ct. 251, 78 L.Ed.2d 238 and *cert. denied,* —— U.S. ——, 104 S.Ct. 497, 78 L.Ed.2d 690 and *cert. denied,* —— U.S. ——, 104 S.Ct. 551,

78 L.Ed.2d 724 (1983); *United States v. Badolato,* 701 F.2d 915 (11th Cir.1983); *United States v. Riola,* 694 F.2d 670 (11th Cir.) ("core" of codefendants' defenses did not conflict), *cert. denied,* —— U.S. ——, 103 S.Ct. 1532, 75 L.Ed.2d 953 and *cert. denied,* —— U.S. ——, 104 S.Ct. 118, 78 L.Ed.2d 117 (1983); *United States v. Varella,* 692 F.2d 1352 (11th Cir.1982) (each defendant attempted to minimize his own involvement at the expense of the other but it was demonstrated that both defendants participated together, as well as individually, in the crucial events arising throughout the course of the conspiracy), *cert. denied,* —— U.S. ——, 103 S.Ct. 3542, 77 L.Ed.2d 1392 and *cert. denied,* —— U.S. ——, 104 S.Ct. 127, 78 L.Ed.2d 124 (1983); *United States v. Carpentier,* 689 F.2d 21 (2d Cir. 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 735, 74 L.Ed.2d 957 (1983); *United States v. Madison,* 689 F.2d 1300 (7th Cir.1982) (each defendant claimed he was innocent and that the other defendant was guilty—court noted, "Each of the defendants accused the other of being the main perpetrator of the offense, as is often the case with codefendants...."), *cert. denied,* —— U.S. ——, 103 S.Ct. 754, 74 L.Ed.2d 971 (1983); *United States v. Provenzano,* 688 F.2d 194 (3d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982); *United States v. Singer,* 687 F.2d 1135 (8th Cir. 1982); *United States v. Talavera,* 668 F.2d 625 (1st Cir.), *cert. denied,* 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982); *United States v. Berkowitz,* 662 F.2d 1127 (5th Cir.1981) (each defendant attempted to minimize his own involvement and cast the other as the more active participant); *United States v. Sellers,* 658 F.2d 230 (4th Cir.1981); *United States v. Calabrese,* 645 F.2d 1379 (10th Cir.1981), *cert. denied,* 451 U.S. 1018, 101 S.Ct. 3008, 69 L.Ed.2d 390 (1982) and *cert. denied,* 454 U.S. 831, 102 S.Ct. 127, 70 L.Ed.2d 108 (1981); *United States v. Wilson,* 657 F.2d 755 (5th Cir. 1981), *cert. denied,* 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 667 (1982); *United States v. Sheikh,* 654 F.2d 1057 (5th Cir.1981), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982); *United States v.*

*Kendricks,* 623 F.2d 1165 (6th Cir.1980); *United States v. Boyd,* 610 F.2d 521 (8th Cir.1979) (codefendant's strategy was to establish defendant as "bad guy" and then disassociate himself), *cert. denied,* 444 U.S. 1089, 100 S.Ct. 1052, 62 L.Ed.2d 777 (1980); *United States v. Brady,* 579 F.2d 1121 (9th Cir.1978), *cert. denied,* 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979); *United States v. Haldeman,* 559 F.2d 31 (D.C.Cir. 1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

III. *Concerning defendant's additional specific claims of prejudice.* In an effort to show sufficient specific prejudice to constitute denial of a fair trial as a result of the joint trial, defendant additionally contends the court erred: a) in reducing by half the number of peremptory challenges and strikes regarding jurors pursuant to former Iowa R.Crim.P. 17(12) (1982); b) in limiting her cross-examination of her codefendant regarding an arrest for a concealed weapon and in attempting to show that it was not unusual for her codefendant to have weapons on him; and c) in sustaining codefendant Hood's objection to the defendant's tape-recorded statement to the police authorities as self-serving.

■ A. *The number of peremptory challenges and strikes of prospective jurors.* In her motion to sever trials, defendant alleged that a joint trial would result in a reduction by one-half in the number of peremptory challenges and strikes in the jury selection process under then Iowa R.Crim.P. 17(12) (1982). Her request for additional challenges and strikes was denied. The court allowed the parties the challenges and strikes stated in the rule. After the jury selection, her counsel stated he would not have peremptorily challenged four jurors who were challenged by Hood's counsel and would have challenged two additional jurors.

Snodgrass concedes that she received the number of challenges provided by the rule and does not allege any constitutional defect in the rule. The halving of the number of peremptory challenges from eight to four under the rule is not a separate articu-

lation of prejudice entitling one to severance. If that were the case, defendants could either never be tried jointly or rule 17(12) would be rendered a nullity. That result is clearly contrary to the legislative intent under the rule.

There is no merit in this claim.

■ B. *Limitation of defendant's cross-examination of codefendant Hood.* Snodgrass next asserts she was prejudiced in her cross-examination of Hood by not being allowed by the court to develop testimony concerning Hood's *arrests* on past weapons charges and that it was not unusual for Hood to have guns about him.

To establish prejudice from denial of her severance motion, she would have to show she would have been able to cross-examine Hood more completely at a separate trial. Both Hood and the State objected to defendant's questions and proffered testimony on the basis of relevance and that any probative value was far outweighed by the prejudicial effect of such testimony.

We have held that evidence of prior *arrests* is inadmissible. *State v. Bauer,* 324 N.W.2d 320, 323 (Iowa 1982). Also, no adequate foundation for habit under the definition stated in *State v. Don,* 318 N.W.2d 801, 806 (Iowa 1982), was contained in defendant's proffer to establish that Hood was in the habit of carrying weapons.

Accordingly, the court was correct in its rulings limiting Snodgrass' cross-examination of Hood. In any event, the record before the jury was clear that Hood was heavily armed on the day Gregory Snodgrass was killed. Exclusion of evidence as to whether Hood was armed on past occasions was harmless error, if error at all.

■ C. *Exclusion of defendant's statement to the police authorities.* Snodgrass had given a tape-recorded statement on September 26, 1981, to police authorities in Missouri. The State did not introduce this statement in its case. Snodgrass testified in detail at the trial as to the events concerning the death of her husband. That testimony was mainly consistent with her prior statement. On direct examination,

she testified about her prior statement. She said the reason for any differences between her prior statement and her trial testimony concerning the shooting was that before making their statements, she and Hood went over their stories and Hood told her what to say in the statement.

She attempted to introduce into evidence her taped statement. Hood objected on hearsay and self-serving grounds. The court sustained Hood's objection that the prior statement was self-serving.

■ Unlike the statement of Hood, which was offered in evidence by Snodgrass to impeach Hood's testimony, Snodgrass' statement was largely consistent with her trial testimony. As such, it is a prior consistent statement and inadmissible as substantive evidence of the facts included in it, because it is hearsay. E. Cleary, *McCormick on Evidence,* § 251 (2d ed. 1972). We conclude the court's ruling excluding the evidence can be upheld on the basis of the hearsay objection. *Citizens First National Bank v. Hoyt,* 297 N.W.2d 329, 332 (Iowa 1980) (Trial court ruling may be affirmed where any proper basis for the ruling appears even though it is not the one upon which trial court based its ruling). Snodgrass was able to fully tell her story as to the killing of the victim and as to the content of her prior statement in her trial testimony. No reversible error occurred as to this issue.

Defendant has been unable to show sufficient specific or general prejudice to constitute denial of a fair trial. She has not shown the court abused its discretion in refusing to sever her trial from that of Hood.

After considering all of defendant's contentions and arguments, whether or not specifically addressed in this opinion, we find no reversible error.

The judgment of conviction of the trial court is affirmed.

AFFIRMED.

All justices concur except HARRIS, McCORMICK and WOLLE, JJ., who dissent.

HARRIS, Justice (dissenting).

Whatever her faults, no matter how strong the evidence was against her, defendant was entitled to a fair trial. Because I am convinced she was denied one, I respectfully dissent. The majority affirms defendant's conviction by imposing its own limited view of the core of her defense.

I have no disagreement with the majority's statement of the facts but point out two additional matters. The majority recites it was the State's theory that defendant and Hood "acted jointly in planning the murder and disposing of the body." This was only one of the theories of their guilt. Both defendants were also charged with, and had to defend against, lesser included offenses. The jury was instructed accordingly.

The need for separate trials was made apparent before, as well as repeatedly during, trial. There were pretrial objections to a joint trial and a number of motions for severance. I think they should have been sustained when it became obvious both defendants were drawn by the fact of their joint trial into a prosecution net, from which each could escape only by convicting the other.

I accept the standard cited by the majority:

[T]he defense of a defendant reaches a level of antagonism (with respect to the defense of a co-defendant) that compels severance of the defendant, if the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant. In such a situation, the co-defendants do indeed become the government's best witnesses against each other. Where two defendants present defenses that are antagonistic at their core, a substantial possibility exists " 'that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.' "

[Authorities.] If the essence of one defendant's defense is contradicted by a codefendant's defense, then the latter defense can be said to "preempt" the former. [Authority.]

*United States v. Berkowitz*, 662 F.2d 1127, 1134 (5th Cir.1981).

The rationale for the antagonistic defenses rule rests on two bases. First, it is inherently prejudicial for a defendant to face multiple prosecutors, or for the State to orchestrate a pit fight in which each defendant's attorney attempts to destroy the other's client. *See United States v. Crawford*, 581 F.2d 489, 491–92 (5th Cir. 1978); *United States v. Johnson*, 478 F.2d 1129, 1133 (5th Cir.1973); *see also People v. Braune*, 363 Ill. 551, 555, 557, 2 N.E.2d 839, 841, 842 (1936). Secondly, a defendant should not face the risk that a jury may become so disgruntled or perplexed by the codefendants' inconsistencies that they will unjustifiably disbelieve both and find both guilty. *See Berkowitz*, 662 F.2d at 1134; *United States v. Halderman*, 559 F.2d 31, 71 (D.C.Cir.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 1103 (1977).

Under this standard severance surely should have been granted. The majority is wrong in suggesting that the two defenses are reconcilable. The prosecutor himself argued that the two defendants could not both be telling the truth. Actually, the core of their defenses was much broader, and more varied, than justification.

Defendant and Hood each presented irreconcilable and mutually exclusive defenses to the specific intent element of both first degree murder and aiding and abetting first degree murder. Aside from the forensic evidence, the testimony of the codefendants was the only evidence of what actually occurred in the Snodgrass house at the time of the shooting. Defendant testified she was in another room when Hood shot her husband during an argument. Hood contends defendant shot her husband as Hood walked into the house. If either story is believed, a jury could reasonably doubt that one of the defendants possessed the requisite specific intent (willfulness, de-

liberation, and premeditation) for first degree murder, or knew the shooter possessed such intent, required for aiding and abetting first degree murder.

At the heart of each defense were two denials. Each denied an intent to kill. Each denied knowledge of the other's intent to kill. Defendant and Hood did indeed differ on the question of who pulled the trigger. More importantly, they disagreed also on whether each knew the intent of the person who pulled the trigger. The absence of such knowledge could well reduce the degree of guilt of either defendant.

Of course the jury might have believed neither defendant's story. It is quite possible that the State sufficiently demonstrated, as it asserted in closing argument, that the defendant and Hood planned the murder in advance. Nevertheless, on the record here, it remains that the jury could have unjustifiably disbelieved both defendants by concluding that their irreconcilable defenses alone demonstrated that both defendants were guilty.

The record amply demonstrates that defendant's trial was indeed a battle in which the codefendants' attorneys attempted to destroy each other's client. Throughout the trial Hood's attorney repeatedly claimed that defendant was lying and attempted to impugn her character. Defendant's attorney took the same approach toward Hood. The State attempted to discredit both defendants. Often the State was even spared the trouble—or risk—of objecting to defense evidence or cross-examination. The objections were soon to come from the other defendant's counsel.

The most damaging unfairness in the situation for both defendants was in the testimony of the other. As the trial progressed it became increasingly urgent for each defendant to waive the fifth amendment privilege and take the stand to testify against the other. And, increasingly, it became more and more crucial for each of them to convince the jury that the other was guilty of firing the fatal shot and was lying by denying it.

It is no answer to argue that the State had a theory that both defendants were guilty, had planned and acted together. Neither is it an answer that there might have been some of the same tensions in separate trials. The tensions were greatly exacerbated by the fact that a circle was drawn around both defendants in the same trial. The circle was then tightened, not only by the prosecution but also by the attempts of each defendant to escape by becoming a star witness against the other.

I recognize that joint trials in criminal cases will often prove to be an efficient way to dispose of multiple prosecutions. In the process, as noted in *State v. Belieu*, 288 N.W.2d 895, 900 (Iowa 1980), jointly tried defendants must expect to yield some of the advantages they might otherwise enjoy in separate trials. But no defendant can be called upon to yield the right to a fair trial. Defendant here was denied one.

I would reverse the defendant's conviction and remand the case for a new, separate trial.

McCORMICK and WOLLE, JJ., join this dissent.