United States Court of Appeals
FOR THE EIGHTH CIRCUIT
No. 96-4180

Michael L. Hood,                  *
                                  *

      Petitioner - Appellee,     *
                                  *

                                  *   Appeal from the United States District
      v.                      *   Court for the Southern District of Iowa.
                                  *

                                  *

James Helling, as Warden of the Iowa   *
State Penitentiary; Tom Miller, Attorney *
General of the State of Iowa,       *
                                  *

      Respondents - Appellants.  *

_____

Submitted: November 18, 1997
Filed: April 14, 1998
_____

Before BOWMAN, LAY, and MURPHY, Circuit Judges.
_____

MURPHY, Circuit Judge.

Michael Hood and Sherryl Snodgrass were convicted after a joint trial in Iowa state court for the first degree murder of Gregory Snodgrass, Sherryl's husband. The district court granted Hood's petition for a writ of habeas corpus under 28 U.S.C.

§ 2254 after concluding that the joint trial had violated his due process rights. The state appeals, and we reverse.[1]

Gregory Snodgrass was killed by a shotgun blast at his home near Ottumwa, Iowa on September 20, 1981. Hood and Sherryl Snodgrass turned themselves in to authorities five days after the killing and gave taped oral statements about their involvement in it. The two had been carrying on an adulterous affair during the preceding months, and Hood had paid a retainer to an attorney to procure a divorce for Sherryl. On the weekend of the killing, Sherryl had driven to Missouri where she picked up Hood. They stopped at his mother's house to get his sawed off shotgun and returned to Iowa with Sherryl's children and several loaded guns including a .357 revolver and a rifle. The shotgun was later determined to have been used to kill Gregory.

Before they reached the Snodgrass home, Hood got out on a dirt road that led to the house and hid for several hours. Then he entered the house through the back door. The stories told by Hood and Sherryl differed as to the actual sequence of events that ensued, but Gregory was shot and then stabbed several times. He died at the scene, and Hood put his body in the trunk of the Snodgrass car along with his shotgun and ammunition. Hood then cleaned up the blood in the house and wiped off fingerprints.

Hood, Sherryl, and her children left for Missouri where they sought help in disposing of the body from the Jumper brothers. Hood had met the Jumpers in the Ku

---

[1]The parties disagree about whether the 1996 amendments to 28 U.S.C. § 2254(d)(1) and (2) apply to this case. Hood filed his petition before the Antiterrorism and Effective Death Penalty Act took effect, but we need not decide whether the amendments apply because the outcome would be the same under either version of § 2254(d).

Klux Klan and with their help he eventually dumped Gregory's body in the Mississippi river. During his visit to the Jumpers, Hood burned various items in their backyard, tried to give away the murder weapon, and exchanged a rifle for the shotgun that had belonged to Gregory. He also left at their house a blood-stained carpet cleaner which had been used to clean up after the killing.

Hood, Sherryl, and the children went on to Springfield, Missouri where they hid in a motel, and the two adults worked out the story they would give to authorities. They turned themselves in on September 25, and Hood originally maintained that he was the one who shot Gregory. He later changed his story and said that it was Sherryl who had pulled the trigger and that he had lied earlier to protect her.

Hood moved for a severance prior to trial under Iowa R. Crim. P. 6(4)(b); the motion was denied, and Hood and Sherryl were tried together. The state's theory at trial was that Hood and Sherryl had planned and executed the killing together and that the one who had not fired the fatal shot was still guilty of murder as an aider and abettor. Both defendants took the position that the killing was justified, but each defendant said that the other was the one who had pulled the trigger. Hood testified that Gregory pointed a shotgun at him when he entered the house, that Sherryl shot Gregory, and that Hood stabbed him when he continued forward. Sherryl testified that she was in the bedroom when she heard Hood and Gregory arguing. Then she heard Gregory walk towards the closet where he kept his shotgun, followed by a shot. She came out of the bedroom, and Hood told her that he had had to kill Gregory in self defense.

The jury convicted Hood and Snodgrass of first degree murder. Both Hood and Sherryl appealed their convictions to the Iowa Supreme Court, arguing that their due process rights to a fair trial were prejudiced by the joint trial because evidence was admitted against each one that would have been inadmissible had they been tried separately. The Iowa court affirmed the convictions, holding that the defendants did

not present mutually antagonistic defenses so it was appropriate to try them together. See State v. Snodgrass, 346 N.W. 2d 472 (Iowa 1984); State v. Hood, 346 N.W. 2d 481 (Iowa 1984).

Hood then brought this habeas corpus petition, and the district court ordered the state to give Hood a new trial within 60 days or release him from custody. The court concluded that the joint trial had violated Hood's due process right to a fair trial in that it forced the codefendants to waive the privilege against self incrimination and led to the introduction of evidence inadmissible in separate trials. The court also determined that Hood's constitutional rights were violated by the admission of his original statements to authorities which contained references to his criminal record and the violation of his parole by interstate travel and possession of weapons, of evidence of membership in the Ku Klux Klan, and of his familiarity with weapons. Additionally, the court found fundamentally unfair the admission of Dr. Allen Silberman's testimony that Sherryl had a passive dependent personality and was thus incapable of taking the initiative in the killing.

The state argues that Hood is barred from raising his federal constitutional claim in this habeas proceeding because he did not first present it in state court, Duncan v. Henry, 115 S.Ct. 887, 888 (1995), but that the state court's factual resolution of whether his defense was antagonistic to that of Sherryl must be accepted if the issue is reached. The state argues further that the defenses at trial were not actually antagonistic and that Hood was not unfairly prejudiced by the presentation of evidence in the joint trial.

Hood responds that his claims were properly presented to the state court, as demonstrated by the Iowa Supreme Court's use of federal constitutional cases to evaluate his claim. He says the question of antagonistic defenses is a mixed question of law and fact so a federal court is not required to defer to the state court determination. He contends that his defense was antagonistic to that of Sherryl because

the jury could not believe him unless it disbelieved her defense that she had had nothing to do with the shooting and did not aid or abet the killing. Finally, he argues that otherwise inadmissible evidence was permitted at the joint trial.

In order for a federal court to have jurisdiction over a habeas claim it must have first been adequately presented to the state court. See Duncan, 115 S. Ct. at 888. A petitioner adequately presents a federal constitutional claim by referring to "a specific federal constitutional right, a particular constutitonal provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue." Myre v. State of Iowa, 53 F. 3d 199, 200 (8th Cir. 1995) (quoting Kelley v. Trickey, 844 F.2d 557, 558 (8th Cir. 1988)). The Iowa Supreme Court referred to Hood's due process right to a fair trial in evaluating his appeal. See Hood, 346 N.W. 2d at 482-83; Snodgrass, 346 N.W. 2d at 475. Hood also made reference in his brief before that court to his due process right to a fair trial. Hood's constitutional claim was therefore adequately presented, and the state court had an opportunity to "pass upon and correct" the alleged violation of federal constitutional rights. Duncan, 115 S.Ct. at 888.

The state argues that even if Hood properly presented his claim, the Iowa Supreme Court determination that the defenses were not mutually antagonistic is controlling under 28 U.S.C. § 2254 (d) (state court findings of fact presumed correct in habeas corpus review). Mixed questions of law and fact are subject to independent review in habeas proceedings, however. See Thompson v. Keohane, 116 S.Ct. 457, 464 (1995). The question of whether the defenses of codefendants are so antagonistic as to constitute a due process violation is such a mixed question because it requires application of the law of severance and due process to the facts developed at trial. See id. at 464-65. Independent review of the question is therefore appropriate. See id.

The state also asserts that the defenses of Hood and Sherryl were not antagonistic and that Hood's right to a fair trial was not infringed, while Hood contends that the denial of a severance was an abuse of discretion that led to a fundamentally

unfair trial. Hood's defense was that he neither shot Gregory nor aided or abetted Sherryl. He presented evidence that would have tended to show, if the jury believed it, that Sherryl killed Gregory to protect Hood and that she was justified in shooting him. Sherryl similarly claimed she neither shot Gregory nor aided or abetted Hood, and she presented evidence to show justification for Hood's action. Hood claims that the defenses were antagonistic because if the jury believed all the details of either story, it would have necessarily found the other defendant to have been the killer.

A habeas petitioner is not entitled to relief on the grounds that he was entitled to a severance unless he can show that a joint trial was fundamentally unfair. See Jenner v. Class, 79 F.3d 736, 741 (8th Cir.), cert. denied, 117 S.Ct. 194 (1996). Fundamental unfairness is shown where mutually antagonistic defenses compromised a specific trial right or prevented the jury from making a reliable determination of guilt or innocence. See id. at 741-42. Mutually antagonistic defenses are those which force the jury to disbelieve the core of one defense in order to believe the core of the other. See United States v. Gutberlet, 939 F. 2d 643, 645-46 (8th Cir. 1990).

The core of each defendant's defense in this case was that neither he or she aided or abetted the killer but that the killer was justified in shooting. The jury could have accepted Sherryl's story that she did not fire the fatal shot and still have believed that Hood was not guilty of murder, however, since he could have shot Gregory in self defense. Likewise, if the jury had believed Hood, it still could have acquitted Sherryl on the ground that she did not commit premeditated murder. Had the jury accepted either defendant's theory of justification, it could have acquitted both of first degree murder under Iowa law. See Snodgrass, 346 N.W. 2d at 477. Since the defenses were not mutually antagonistic, the trial court's failure to sever is not a basis for a due process violation. See Jenner, 79 F. 3d at 741.

Hood also argues that the joint trial led to the admission of evidence that could not have been used against him had he been tried alone, and that this denied him the

specific due process right to be tried only on evidence admissible against him.  In support he points to the admission of testimony of Dr. Silberman, references to his prior criminal record and parole violations, his Ku Klux Klan membership, his familiarity with guns, and Sherryl's original statement.

The trial court allowed Sherryl to play Hood's original statement to the police in which he made references to his parole and criminal record and to cross examine witnesses on the subject.  The Iowa Supreme Court ruled that Hood's convictions and parole violations were admissible to show why he and Sherryl had fled the scene of the crime and why they did not notify authorities immediately after the killing, since Hood was not supposed to leave Missouri or carry firearms.  See Hood, 346 N.W. 2d at 483.  The Iowa court found that such evidence did not unfairly prejudice Hood because it offered a nonincriminating reason for the couple's departure from Iowa.  See id. at 484.  We do not disagree, and the admission of this evidence did not render Hood's trial fundamentally unfair.

Hood complains that Sherryl's testimony at trial and her introduction of his recorded statement in which he admitted shooting the victim demonstrated antagonism between the codefendants and violated his right to a fair trial.  Accusations between codefendants at a joint trial and the admission of evidence by one party that is harmful to the other do not necessarily make a trial fundamentally unfair.  See Zafiro v. United States, 506 U.S. 534, 538 (1993).  Hood concedes that this evidence would be admissible against him if he were tried alone, and its introduction at a joint trial did not violate his constitutional rights.

Hood also complains that Sherryl brought out his familiarity with weapons during cross examination.  The Iowa Supreme Court found that this evidence was cumulative and did not merit reversal.  See Hood, 346 N.W. 2d 484.  In light of the admissible evidence at trial concerning Hood's trades for firearms and his transportation of an

arsenal of weapons to the scene of the killing, any additional evidence of his familiarity with guns was merely cumulative and it did not violate his due process right.

Sherryl called Dr. Silberman to testify that she had a "passive dependent" personality and was subject to manipulation in support of her defense that she neither intended nor planned to kill her husband. Hood argues that this testimony made his trial fundamentally unfair because it tended to show that he must have planned the crime. Even if the evidence would have been inadmissible at a separate trial, it did not violate his due process right to a fair trial because the testimony was not inconsistent with Hood's theory of defense. The jury could have believed Dr. Silberman and still have found that either of the defendants shot Gregory in self defense and that neither planned the killing. Moreover, on cross examination, Dr. Silberman admitted that Sherryl was capable of violent acts such as striking her mother, thus undercutting his theory.[2]

Hood also challenges evidence Sherryl brought out during her cross examination of the Jumpers to show his membership in the Ku Klux Klan and its propensity toward violence. Hood became acquainted with the Jumpers as fellow Klan members, and he hoped that their common tie would cause them to help hide Gregory's body. The evidence was thus properly admitted to explain why Hood felt he could go to the

---

[2]Before oral argument, Hood filed a motion for the court to take judicial notice that Dr. Silberman's license to practice as a psychologist had been revoked because he was having a sexual relationship with Sherryl during the time he was treating and evaluating her in preparation for trial. Hood argues that evidence of this relationship calls into question the truthfulness of Silberman's testimony and the reliability of the jury's verdict. The jury convicted both defendants of murder, however, so it must have disbelieved Dr. Silberman's testimony that Sherryl could not have been responsible for murder. The court declines to take official notice of the details of the license revocation or the sexual relationship because the additional evidence would not entitle Hood to habeas relief.

Jumpers for assistance in disposing of a dead body. The admission of this evidence did not violate his due process rights.

Hood further contends that Sherryl's cross examination of witnesses and her closing argument shifted the blame to him, violating his constitutional right to a fair trial. He claims it was unfair of Sherryl to suggest for the first time during closing that Hood had a motive for the killing. Mere finger pointing among codefendants during trial and closing argument is not a basis for habeas relief, however. See Jenner, 79 F.3d at 742 (citing Zafiro, 506 U.S. at 540). Sherryl's questioning and closing argument presented the evidence in a light favorable to her but did not violate Hood's constitutional right to a fair trial.

Finally, Hood argues that the jury was unable to compartmentalize the evidence or to determine his guilt or innocence only on evidence that pertained to him, and that this made his trial fundamentally unfair. He points to Dr. Silberman's testimony, the tape of his statement to Iowa authorities, and evidence of his prior convictions and parole violation. The only cited evidence that might have been inadmissible in a separate trial was Dr. Silberman's testimony, and this evidence did not inculpate Hood. If it were believed, it only tended to show that Sherryl could not have committed first degree murder, not that Hood definitely did. It was thus irrelevant to Hood's defense that the shooting was justified.

For these reasons, the order of the district court granting relief to the petitioner is reversed, and the case is remanded for entry of judgment in favor of the state.

LAY, Circuit Judge, dissenting.

I respectfully dissent. As the experienced district judge points out, there should be little question the defenses urged by the petitioner Michael Hood and his co-defendant were mutually antagonistic. Each accused the other of pulling the trigger of

-9-

the gun that killed Sherryl Snodgrass' husband.  To urge that such defenses were not irreconcilable defies common acceptance of that term.

Irreconcilability requires severance when "there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.'" United States v. Basile, 109 F.3d 1304, 1310 (8th Cir.) (quoting United States v. Delpit, 94 F.3d 1134, 1143 (8th Cir. 1996)), cert. denied, __ U.S. __, 118 S.Ct. 189 (1997).  Given the conflicting testimony of these two co-defendants, the irreconcilability of their defenses could not be more clear.  As Justice Harris' strong dissent in the Iowa Supreme Court opinion notes:

> The rationale for the antagonistic defenses rule rests on two bases.  First, it is inherently prejudicial for a defendant to face multiple prosecutors, or for the State to orchestrate a pit fight in which each defendant's attorney attempts to destroy the other's client.  Secondly, a defendant should not face the risk that a jury may become so disgruntled or perplexed by the codefendants' inconsistencies that they will unjustifiably disbelieve both and find both guilty.

Snodgrass, 346 N.W.2d at 480 (Harris, J., dissenting) (citations omitted).

The majority argues that the jury could have accepted Ms. Snodgrass' story that she did not fire the fatal shot and still have believed Hood was not guilty of  murder, because Ms. Snodgrass testified that Hood acted in self-defense in shooting Gregory Snodgrass.  This misses the point.  As Justice Harris pointed out, the core of the defenses presented by Hood and Ms. Snodgrass were much broader than justification.  Specifically, they each presented irreconcilable and mutually exclusive defenses to the specific intent element of both first-degree murder and aiding and abetting first-degree murder.  As Justice Harris observed, the joint trial "was indeed a battle in which the co-defendants' attorneys attempted to destroy each other's client."  Snodgrass, 346

-10-

N.W.2d at 481.  Each defendant claimed the other defendant was lying.  How much more evidence of irreconcilability is needed?

Each defendant denied an intent to kill, and each denied knowledge of the other's intent to kill.  Significantly, they disagreed on whether each knew the intent of the person who pulled the trigger.  These are not just simple inconsistencies in testimony; they are clearly irreconcilable versions of events.  Justice Harris points out that even the prosecutor at trial argued that the two defendants could not both be telling the truth.  Snodgrass, 346 N.W.2d at 480.  Jurors could not believe the "core" of Hood's defense—that he did not pull the trigger—without disbelieving Ms. Snodgrass' "core" defense that he did.  See Gutberlet, 939 F.2d at 645-46.

However, conflicting defenses alone are not enough to mandate severance.  In Zafiro, 506 U.S. at 538, the Supreme Court ruled that  "[m]utually antagonistic defenses are not prejudicial per se."  Instead, the Court stated that severance is warranted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539.  The Court stated: "Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted . . . ." Id.  This scenario which the Supreme Court identified as highly prejudicial is exactly what took place at Hood's trial.

Ms. Snodgrass' first witness was Dr. Allen Silberman, who testified that he had diagnosed Sherryl as a "passive dependent personality" with low self-esteem, who "would tend to subordinate her own needs for other people upon whom she is dependent."  Dr. Silberman also stated that Ms. Snodgrass "would go along with many things without questioning," and as a rule, people with this disorder do not become violent.  During closing arguments, Ms. Snodgrass' attorney emphasized Dr.

Silberman's assessment of Ms. Snodgrass' passive-dependent personality and portrayed Hood as the aggressor in the relationship.

Two years after Hood's criminal appeal was completed, the State of Iowa revoked Silberman's license to practice psychology when it was learned that Silberman had a sexual relationship with Ms. Snodgrass while he was treating and evaluating her in preparation for his trial testimony. The majority declines to take judicial notice of the details of the license revocation or the sexual relationship, stating the additional evidence would not entitle Hood to habeas relief. See supra note 2.

This testimony would not have been admitted into evidence if Hood had been tried alone. The State in fact objected to the calling of Silberman at trial, arguing he was improperly giving an opinion on Hood's likelihood to commit a crime. The result of Silberman's testimony was to shift the blame of the crime away from Ms. Snodgrass (as the "passive-dependent") and on to Hood (as the aggressor.) The prejudice to Hood is compounded by the fact that, in light of Silberman's sexual relationship with Ms. Snodgrass, his testimony now must be viewed as shockingly biased and unreliable. It is difficult for me to assess this prejudice as anything but constitutional error.

The majority further argues that the admission of some of the evidence presented by Ms. Snodgrass did not render Hood's trial fundamentally unfair, because much of this evidence would have been admissible against Hood if he was tried alone. Assuming this is true, the dynamics of the joint trial still amounted to a tag-team prosecution against Hood and Ms. Snodgrass, as each side desperately tried to pin the blame on one another. In Zafiro, Justice Stevens recognized that joinder may be highly prejudicial "in cases . . . in which mutually exclusive defenses transform a trial into more of a contest between the defendants than between the people and the defendants.'" 506 U.S. at 543 (Stevens, J., concurring) (quoting People v. Braune, 2 N.E.2d 839, 842 (Ill. 1936)). This is exactly what happened here, as Hood was forced

to fend off attacks from both the prosecutor and his co-defendant. As Justice Harris poignantly put it:

> The tensions [between Hood and Ms. Snodgrass] were greatly exacerbated by the fact that a circle was drawn around both defendants in the same trial. The circle was then tightened, not only by the prosecution but also by the attempts of each defendant to escape by becoming a star witness against the other.

Snodgrass, 346 N.W.2d at 481.

For these reasons, I believe it clear that the mutually antagonistic defenses prevented the jury from making a reliable judgment about Hood's guilt or innocence on the first-degree murder charge. This extreme prejudice rendered Hood's trial fundamentally unfair, and in turn constituted a violation of the defendant's right to due process. His conviction should be reversed, and a separate trial should be granted.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-13-