**STATE of Iowa, Appellee,**

v.

**Jay Winston HOLLINS, Appellant.**

**No. 84–20.**

Supreme Court of Iowa.

Dec. 17, 1986.

Rehearing Denied Jan. 13, 1987.

Charles L. Harrington, Appellate Defender, and Raymond E. Rogers, Asst. Appellant Defender, for appellant.

Thomas J. Miller, Atty. Gen., Joseph P. Weeg, Asst. Atty. Gen., and James C. Bauch, Co. Atty., for appellee.

REYNOLDSON, Chief Justice.

Jay Winston Hollins stands convicted of first-degree murder for knowingly aiding and abetting Ronald Harris Brown in the murder of Alvin Davidson, a Waterloo attorney. Hollins and Brown were tried jointly, and today we have filed a separate opinion in Brown's appeal. *See State v. Brown*, 397 N.W.2d 689 (Iowa 1986). Several issues raised by Hollins mirror issues rejected in *Brown*, and will be discussed only briefly in this opinion. With respect to Hollins' appeal, we find no reversible error and affirm.

The facts surrounding Davidson's murder are detailed in *Brown*, 397 N.W.2d at 694, and will not be repeated here.

Murder charges were filed against three men, Jay Hollins, Ronald Brown, and Ennis Montgomery, on or about February 17,

1983. Following their arrests, Montgomery turned State's evidence in exchange for immunity from prosecution.

Hollins and Brown were tried jointly before a jury. The State's prosecution theory was that Hollins knowingly aided and abetted Brown, who actually murdered Davidson. The jury found both defendants guilty of first-degree murder. Hollins' appeal from the judgment entered on the jury verdict is now before us.

I. Hollins contends trial court should have granted his motion to suppress the testimony of Montgomery, the third person charged with Davidson's murder. Shortly after his arrest, on March 2, 1983, Montgomery entered into an immunity agreement with the State that required his eventual trial testimony be "the same as his sworn testimony given to the State . . . on the 3rd day of March, 1983." In early April, Montgomery began receiving a twenty-five dollar a day witness fee. *See* Iowa Code § 815.6 (1983).

On appeal as at trial, Hollins argues the language of the immunity agreement requiring Montgomery's trial testimony be the "same" as his March 3, 1983, testimony, coupled with the twenty-five dollar per day witness fee, evidenced a corrupt bargain.

■ Trial court thoroughly reviewed Hollins' contention and in effect concluded reasonable minds could disagree on whether the language of the immunity agreement, coupled with the witness fee arrangement, evidenced a corrupt bargain. We agree, and for the reasons we set out in *Brown*, 397 N.W.2d at 693, hold trial court was right in denying Hollins' motion to suppress Montgomery's testimony.

II. Hollins' second challenge to Montgomery's testimony essentially attacks the sufficiency of the evidence and raises the question whether Montgomery's testimony was supported by corroborative evidence.

This record, without reference to Montgomery's testimony or testimony concerning Hollins' attempt to procure the murder weapon, read in its most favorable light,

reasonably would permit a jury to find the following facts with respect to Hollins' activities: (1) December 1982, Hollins, at his brother's request, contacted Brown and asked him to travel to Waterloo; (2) the contact was made after Hollins' brother Jan was jailed on a charge of attempting to murder Davidson; (3) Brown, who at Hollins' request was known only as "Joe," arrived in Waterloo on January 3, 1983, and was met by Hollins and Montgomery; (4) between January 3 and January 10, Hollins and Brown spent a significant amount of time together; (5) January 7, 1983, Hollins borrowed a Volkswagen van from Ernie Balkman; (6) January 10, shortly before Davidson's murder, the van was seen in the alley running between the Russell Lamson Hotel and the Central Battery building; (7) Brown and an unidentified black man, potentially Hollins, were seen in the van; (8) after the murder, a vehicle in Hollins' possession was used to transport Brown from Waterloo to Des Moines; and (9) Hollins subsequently warned people not to talk about the murder and to never mention having seen or met "Joe."

■ While this evidence is largely circumstantial, it arguably would support the reasonable inference Hollins was actively involved in planning and carrying out Davidson's murder.

■ However, assuming this evidence alone is insufficient to support such an inference, Montgomery's testimony, if corroborated, without question is sufficient to uphold Hollins' conviction. This testimony, which we detailed fully in *State v. Brown*, 397 N.W.2d 689, 695 (Iowa 1986), directly implicates Hollins as a key player in the dry run shortly before the murder and strongly underscores Hollins' role in getting Brown out of Waterloo immediately after the murder. Further, assuming Montgomery was an accomplice, we conclude his testimony was sufficiently corroborated, as required by law. *See id.* at 694.

With respect to Hollins, Montgomery's testimony concerning the January 10 dry run is corroborated by several pieces of

evidence. Ronald Mannion, an employee of Central Battery, testified he saw a van similar to Balkman's in the alley next to the Russell Lamson Hotel in the afternoon of January 10, the day of the murder. He positively identified Brown as sitting in the passenger seat and testified an unidentified black man was sitting in the back. This evidence supported Montgomery's testimony that during the dry run Brown was in the passenger seat and Hollins, a black man, was in the back.

■ Evidence further connecting Hollins with the dry run came from Janie Middleton, Hollins' aunt. Middleton's testimony placed Hollins, Brown, and Montgomery in Balkman's van the afternoon of the murder. Middleton also testified that on January 10 she asked Hollins to pay her electric bill. This testimony, coupled with a canceled check and a receipt indicating payment on January 10, supported Montgomery's testimony that immediately after the dry run they stopped at the I.P.S. building and Hollins paid an electric bill. The fact Montgomery believed the bill was Debra Hodges' rather than Janie Middleton's goes only to the sufficiency of the corroborative evidence, a jury question, and not to its existence, a legal question. *See id.* at 694–95.

Montgomery also testified that immediately before the murder, Brown pulled out a shotgun from the back of Balkman's van which was wrapped in a "reddish looking" blanket. This blanket, or one like it, was tied to Hollins in several respects.

First, Hollins himself admitted borrowing a brown and white plaid blanket from Janie Middleton and putting it in the van. Second, Middleton testified she saw the blanket in the van and never got it back. She also testified the blanket was a wraparound blanket with snaps. Finally, Balkman testified that when the van was returned to him (after the murder) he found a fairly large, plaid "sack" with snaps on it in the back of the van. He threw the "sack" away.

Finally, Montgomery testified that following the murder Hollins directed him to get Brown out of town and to Des Moines.

In furtherance of this plan, Montgomery testified he met with Hollins' father after the murder to cash a money order belonging to Hollins. The money received was used to pay for Brown's transportation out of town. In support of Montgomery's evidence, Hollins' father testified he met Montgomery the evening of the murder and gave Montgomery cash in return for a money order made out to Hollins.

The total evidence presented against Hollins, while not overwhelming, unquestionably was sufficient to support a guilty verdict. Although evidence corroborating Montgomery's testimony is not without contradiction, it nonetheless exists; whether it was sufficient was for the jury to decide. We find Hollins' claims of insufficient evidence and lack of corroboration are without merit.

III. Hollins also attacks the admission of testimony given by Debra Jackson and William Hodges. Both individuals knew Hollins; Hodges is Hollins' cousin. Their testimony was used by the State primarily to explain the circumstances surrounding the theft of the shotgun that became the murder weapon.

Shortly after Davidson's death, the murder weapon, which had been recovered by the police, was identified by Will Campbell who saw the shotgun on television. Campbell first noticed the gun was missing from his car trunk in the early hours of January 1, 1983, approximately ten days before the murder.

At trial, the State properly sought to establish the circumstances surrounding the gun's disappearance. Central to that attempt was the testimony of Jackson and Hodges. Their testimony, viewed in its most favorable light, established the following circumstances.

Late in December Jackson received a telephone call at her home. An unidentified woman asked to speak to Hodges, who lived with Jackson. After the conversation, Hodges and Jackson discussed where they could get a gun.

Jackson knew Campbell owned a shotgun and that he kept it in the trunk of his car. Jackson decided she would ask Campbell to use his car and then unlock the car's trunk and leave it open. To gain access to the car, Jackson called Campbell and invited him to a New Year's Eve party at her home. Before the party, Hodges received a second telephone call in which he told the same unidentified caller what car to look for, approximately where it would be parked, and about what time it would be there.

On New Year's Eve, Campbell attended Jackson's party. Jackson was not required to ask Campbell for his car keys because the latter sent her with the keys to his car for a bottle of gin kept in the trunk. After retrieving the gin, Jackson left the trunk slightly open. After midnight, Campbell, whose car was out of gas, opened the trunk to get a gas can and found the shotgun missing.

A few days later Hollins, in a telephone conversation with Hodges, thanked the latter for the weapon.

Hollins contends trial court erroneously overruled his hearsay objections to Jackson's testimony that after the first telephone call she and Hodges discussed how to obtain a weapon. Hollins argues this testimony, based wholly on what Hodges was told by the anonymous caller, constitutes inadmissible double hearsay. Even accepting Hollins' contention Jackson's testimony was double hearsay, his challenge to it is nevertheless meritless.

Hodges testified that following the anonymous telephone call he and Jackson had a discussion. Hodges also testified that as a result of that discussion, he and Jackson decided to figure out a way to obtain a weapon.

■ Hodges' testimony on this point was admitted without objection. It was virtually identical to Jackson's testimony that Hollins claims was admitted erroneously. Even if admission of Jackson's testimony was error, in light of Hodges' virtually identical, unchallenged testimony, that er-

ror was not prejudicial. *See State v. Sowder*, 394 N.W.2d 368, 372 (Iowa 1986); *State v. Galvan*, 297 N.W.2d 344, 347–48 (Iowa 1980); *State v. Gilmore*, 259 N.W.2d 846, 858 (Iowa 1977).

Hollins asserts two additional segments of testimony should have been excluded by his hearsay objections. In the course of Jackson's direct examination, the State asked, "Who did you think that you were ultimately making that gun available to?" Over Hollins' timely objection, Jackson answered, "For Jay."

In a similar vein, during direct examination of Hodges, the State asked with reference to the unidentified caller, "What did she [the caller] say to you ...?" Trial court overruled Hollins' hearsay objection and Hodges answered, "Jay felt as though he was in trouble and might need some protection." Hollins argues both of these statements were inadmissible hearsay.

■ Under our rules, "hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Iowa R.Evid. 801(c). Statements that otherwise would be considered hearsay, offered not for the purpose of proving the truth of the statements but rather offered to help explain relevant conduct taken in response to them, are not hearsay and are not excludable as such. *State v. Coburn*, 315 N.W.2d 742, 746 (Iowa 1982).

In reviewing trial court's admission of evidence the State argues was offered for the purpose of explaining certain responsive conduct, we do not blindly accept as controlling the purpose urged by the State. Rather, we review the relevant record to determine if the purpose voiced by the State can reasonably be found to be the real purpose for which the challenged testimony was offered. *See Sowder*, 394 N.W.2d at 371; *State v. Horn*, 282 N.W.2d 717, 724 (Iowa 1979).

■ For us to conclude the State's purpose in offering challenged testimony was in fact to explain certain responsive con-

duct, not only must the offered statement actually tend to explain the responsive conduct, but that conduct must itself be relevant to some aspect of the State's case. If the statements in issue are relevant only if accepted as true, the statements are hearsay and, unless subject to some other applicable exception, are inadmissible. *See Galvan*, 297 N.W.2d at 347; *Horn*, 282 N.W.2d at 724.

This two-step analysis in reviewing hearsay objections to evidence assertedly offered for a purpose other than its truth focuses more precisely the thrust of cases like *Sowder* and *Horn*, in which we examined the record for the "real" purpose for which evidence was offered. By "real" purpose, this court has never suggested it was attempting to look into the mind of the offerer to see what subjective purpose might be present. Such a search would be speculative at best and would tend to restrict the offerer's right to offer evidence for any permissible reason.

The test we apply is a structured, objective approach to a difficult ruling. If, on a review of the record, the evidence is deemed relevant and otherwise admissible for the purpose for which it supposedly was offered, then that purpose is supported objectively in the record and will be accepted. *See Sowder*, 394 N.W.2d at 371.

Cases such as *Sowder, Galvan*, and *Horn* are consistent with this approach. In each of those cases, we determined the evidence challenged was either irrelevant when viewed in the light of the purpose for which it supposedly was offered or, when viewed in context, was obviously an attempt to put before the fact finder evidence beyond that necessary to accomplish the purpose for which it supposedly was advanced. *See Sowder*, 394 N.W.2d at 371–72; *Galvan*, 297 N.W.2d at 347; *Horn*, 282 N.W.2d at 724.

■ Here, the State asserts the statements in controversy were offered not for their truth but rather to help explain Jackson's and Hodges' responses to the otherwise wholly unexplained and mysterious telephone call. Jackson's belief the gun

was for Jay, and Hodges' statement the caller said Jay was in trouble and needed protection, coupled with the undisputed evidence they both had known Hollins for a number of years, tends to explain the basis for their subsequent actions regardless of whether Jay in fact requested or in some way needed protection. Further, the State clearly had the right to develop fully the circumstances leading to the theft of the murder weapon. Jackson's and Hodges' conduct set in motion by the telephone call was central to developing those circumstances. We conclude the two statements challenged by Hollins were not offered for their truth but rather in explanation of later relevant actions. The statements thus were not excludable as hearsay.

Hollins argues, however, that even if otherwise admissible these statements were so prejudicial as to mandate their exclusion. We disagree.

■ Trial court took precautions to limit the jury's consideration of these statements. Particularly with respect to Hodges' statement, the court clearly explained the purpose for which it was offered and the limitations on the jury's consideration of it. Trial court also included a similar admonition in its final instructions. Finally, there is evidence in the record from which the jury could find Hollins later called Hodges and thanked him for the weapon. No substantial prejudice has been shown.

■ As an additional ground for reversal, Hollins asserts admission of these statements, originating from an unknown caller, violated his right under the United States Constitution to confront hostile witnesses. Because we have concluded the challenged statements were not hearsay, Hollins' argument is foreclosed by a recent Supreme Court case, *Tennessee v. Street*, which held no confrontation clause concerns are raised when out-of-court statements are admitted for nonhearsay purposes. 471 U.S. 409, 413–14, 105 S.Ct. 2078, 2081–82, 85 L.Ed.2d 425, 431 (1985). In such a case, the fundamental role of the

confrontation clause in protecting cross-examination is satisfied by the witness's presence on the stand. *Id.*

IV. Two final grounds for reversal advanced by Hollins relate to trial court's refusal to sever his trial from Brown's and this court's decision to limit the length of Hollins' appellate brief to sixty-five pages. With one minor exception involving the severance contention, we rejected these grounds in Brown's appeal. *See State v. Brown,* 397 N.W.2d 689, 697 (Iowa 1986). For the same reasons, we likewise reject them here.

With respect to severance, Hollins, in a footnote, argues his right of confrontation was violated when, because of the joint trial, certain statements made by Brown to investigators were admitted into evidence. These statements would not have been admitted into evidence had Hollins been tried alone. For authority Hollins relies on *Bruton v. United States,* 391 U.S. 123, 136–37, 88 S.Ct. 1620, 1628, 20 L.Ed.2d 476, 485 (1968).

At trial Hollins raised only general hearsay objections to the questions that elicited these statements. These general objections were "too broad to raise the issue of constitutional right of confrontation." *State v. Farni,* 325 N.W.2d 107, 109 (Iowa 1982). Trial court was given no reasonable opportunity to consider the confrontation clause implications, and we will not consider this contention for the first time on appeal.

We affirm the judgment entered by district court.

AFFIRMED.