STATE of Iowa, Appellee,

v.

Ronald Harris BROWN, Appellant.

No. 84–22.

Supreme Court of Iowa.

Dec. 17, 1986.

Rehearing Denied Jan. 13, 1987.

Paul T. Shinkle of Gottschalk, Shinkle & Long, Cedar Falls, for appellant.

Thomas J. Miller, Atty. Gen., Joseph P. Weeg, Asst. Atty. Gen., and James Metcalf, Co. Atty., for appellee.

REYNOLDSON, Chief Justice.

Ronald Harris Brown and Jay Winston Hollins were convicted of first-degree murder in the death of Alvin Davidson, a Waterloo attorney. Hollins' appeal is addressed in a separate opinion also filed today. *See State v. Hollins*, 397 N.W.2d 701 (Iowa 1986). Here, we address Brown's appeal and the issues raised in it. Finding no basis for reversal, we affirm the judgment sentencing him to life imprisonment.

Alvin Davidson was murdered on January 10, 1983, as he was about to enter the Russell Lamson Hotel in Waterloo. He died at the hands of a masked man wearing blue jeans and an Army field jacket, who fired a single blast from a twelve-gauge shotgun.

A little over a month after Davidson's death, murder charges were filed against three men, Jay Hollins, Ronald Brown, and Ennis Montgomery. Subsequently, Brown and Hollins were jointly tried by jury and convicted of first-degree murder. Trial court entered judgment, and Brown's appeal from that judgment is now before us.

I. Brown's initial two challenges center on the testimony of Ennis Montgomery, the third individual charged in Davidson's murder. Shortly after his arrest, Montgomery, on March 2, 1983, entered into an immunity agreement with the State in which he agreed to testify against Brown and Hollins. In April, under separate court order, Montgomery began receiving a twenty-five dollar a day witness fee.

Before trial, Brown moved to suppress Montgomery's testimony. Brown argued language of the immunity agreement that required Montgomery's trial testimony be "the same as his sworn testimony given to the State ... on the 3rd day of March, 1983," coupled with the twenty-five dollar per day witness fee, evidenced a corrupt bargain impermissibly tainting Montgomery's testimony and rendering it inadmissible. Brown particularly emphasized his view the immunity agreement did not call for Montgomery to testify truthfully, but rather required Montgomery to give the "same" testimony he gave on March 3 regardless of whether or not that testimony was true.

Responding, the State denied the immunity agreement required Montgomery to follow any set script in his trial testimony. The State supported its position by pointing to statements in the agreement that granted immunity "in exchange for [Montgomery's] truthful testimony in the investigation and subsequent trial arising out of the death of Alvin Davidson" and warned that "failure to testify truthfully, under oath, shall subject [Montgomery] to the penalties of perjury." The State further disputed Brown's contention a twenty-five dollar per day witness fee evidenced any type of corrupt bargain.

The applicable law is undisputed. The controlling Iowa case is *State v. DeWitt*, 286 N.W.2d 379 (Iowa 1979), *cert. denied*, 449 U.S. 844, 101 S.Ct. 127, 66 L.Ed.2d 53 (1980). In *DeWitt*, we made clear that when "the prosecutor or sentencing judge, in combination or singly, bargains with an accomplice for false or specific testimony

or a specific result, the accomplice's subsequent testimony is tainted and inadmissible." *Id.* at 384. We also pointed out, however, that "no unnecessary barriers should be imposed on the State's option to bargain for truthful testimony" and expressed our "confidence in our adversary system and the tool of cross-examination to expose fraud to the jury." *Id.* at 386.

The *DeWitt* court held, and we today reaffirm, that "except where no reasonable person could avoid finding a corrupt bargain has been struck, the accomplice's testimony should be weighed by the jury following liberal cross-examination to expose all factors which might influence the witness." *Id.* Cross-examination, of course, includes the right to bring out and develop fully the existence of any type of immunity agreement or witness fee arrangement.

In light of the above law, we turn to the record before us. Following Brown's motion, trial court held an evidentiary hearing at which the persons involved in the immunity and per diem agreements were subjected to direct and cross-examination. Trial court found negotiations for the immunity agreement were initiated by James Beeghly, who at that time was Montgomery's attorney. Bargaining began after Beeghly, conferring with his client over the weekend of February 26–27, 1983, advised Montgomery to break his silence and to tell the truth about what he knew.

Montgomery and the State subsequently entered into an immunity agreement on March 2, 1983, which contemplated a sworn statement from Montgomery the following day. At that time, the State did not know the extent, detail, or content of Montgomery's statement. There was no script set for him to follow, and the only stipulation required by the State was that Montgomery's March 3 statement be truthful.

Turning to Montgomery's per diem witness fee, trial court found the State refused to have any part in arranging for such fees prior to Montgomery's March 3 statement. The court also found that at the time of his March 3 statement Montgomery knew nothing about any per diem fee other than that his attorney would pursue the matter. Some time after March 3, attorney Beeghly filed a formal application and obtained a court order authorizing the fee. *See* Iowa Code § 815.6 (1983) (authorizing payment of fee to material witness for each day confined). The State neither supported nor resisted that motion and subsequent order.

Based on these findings, which the record supports, trial court concluded it could not find as a matter of law the immunity agreement was corrupt and thus tainted Montgomery's testimony and rendered it inadmissible at trial. We agree with trial court that reasonable minds could differ on the question of whether a corrupt bargain was struck. Thus, under *DeWitt*, trial court committed no error when it admitted Montgomery's testimony.

II. Brown's second challenge to Montgomery's testimony concerns the question of corroboration and is essentially an attack on the sufficiency of the evidence. This contention is equally meritless.

Davidson was murdered on January 10, 1983. Evidence totally independent of Montgomery's testimony was sufficient to allow a jury to find the following sequence of events leading up to and including that date: (1) Brown arrived in Waterloo on January 3 at the request of Jay Hollins; (2) Brown was a close friend of Jay's brother Jan who was in jail awaiting trial on a charge of attempting to murder Alvin Davidson; (3) while in Waterloo Brown, who went only by the name "Joe," purchased shotgun shells of the same type used to murder Davidson; (4) Brown was observed studying Davidson's travel to and from the hotel where he lived; (5) January 10, 1983, within a short time after Brown was observed in the area, Davidson was murdered as he entered the Russell Lamson Hotel by a masked man wearing an Army jacket similar to one Brown had been seen wearing and wielding a shotgun that contained shells of the same type earlier purchased by Brown; and (6) immediately after the murder Brown left Waterloo and

traveled to Des Moines where he caught a bus back to Arizona.

This evidence and the reasonable inferences to be drawn from it arguably constitute substantial evidence of guilt and thus are sufficient to uphold Brown's conviction without any consideration of Montgomery's testimony. When we consider Montgomery's testimony, however, the case against Brown is even stronger.

While in Waterloo, Brown stayed at the home of Annie Redd, Montgomery's girl friend. Montgomery testified that on the afternoon of January 10, 1983, Brown and he left Redd's and drove to the home of Janie Middleton, Hollins' aunt. Here, they picked up Hollins.

Hollins, Brown, and Montgomery left Middleton's riding in a Volkswagen van owned by Ernie Balkman. After eating lunch, they drove to the Russell Lamson Hotel. Montgomery drove into the alley separating the hotel and the Central Battery building and parked the van near the back of Central Battery.

After glancing up and down the alley, Hollins, who was sitting in the back, asked Brown, "What do you think, Joe?" Brown responded, "It should be a cinch. It should be no trouble at all."

The three then left the area. After stopping briefly at the I.P.S. building, they returned to Janie Middleton's house. Balkman arrived shortly; he and Hollins departed in a Blazer Hollins was using. Montgomery and Brown left in Balkman's van.

Brown and Montgomery proceeded to the courthouse and waited for Davidson to leave work. When Davidson came out, they followed him to his hotel. The car in which Davidson was riding parked in front of the hotel. Montgomery drove into the same alley the three had visited earlier.

When Montgomery stopped the van Brown reached behind Montgomery and picked up a "reddish looking" blanket from which he unwrapped a shotgun. He pulled on a ski mask and proceeded down the alley. Brown was wearing blue jeans and an Army fatigue jacket. Montgomery parked the van as before and waited.

A few minutes later, Montgomery heard a shotgun blast. He turned to see Brown running down the alley. Brown dropped the shotgun on a dumpster in the alley and jumped in the van, cursing the fact he had been unable to shoot Davidson more than once.

Montgomery and Brown then fled the area. Rather than return to Janie Middleton's, they went to the house of Janie Middleton's daughter, Debra Hodges. Hollins arrived, and after a brief exchange, told Montgomery they had to get Brown out of Waterloo and to Des Moines. Later that evening, Montgomery drove Brown to Des Moines where, after telling Montgomery to keep quiet, he took a bus back to Arizona.

Montgomery's testimony alone, if corroborated, was sufficient to support Brown's conviction. The law in the area of corroboration is well settled. The Iowa Rules of Criminal Procedure provide:

A conviction cannot be had upon the testimony of an accomplice ... unless corroborated by other evidence which shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

Iowa R.Crim.P. 20(3).

The requirement of corroborative evidence serves two purposes. First, it independently tends to connect defendant to the crime. Second, it supports the credibility of an accomplice whose motives are clearly suspect because of the accomplice's self-interest in focusing blame on the defendant. *State v. Berney*, 378 N.W.2d 915, 918 (Iowa 1985); *State v. Cuevas*, 281 N.W.2d 627, 629 (Iowa 1979).

The existence of corroborative evidence is a question of law; the sufficiency of that evidence ordinarily is a question of fact. *State v. Doss*, 355 N.W.2d 874, 880 (Iowa 1984); *State v. Ware*, 338 N.W.2d 707, 710 (Iowa 1983). Evidence asserted as corroborative of an accomplice's testimony

will be sufficient to create a jury question if that evidence corroborates some material aspect of the accomplice's testimony tending to connect defendant to the commission of the crime and thereby supports the credibility of the accomplice. *Berney*, 378 N.W.2d at 918; *State v. Hutchison*, 341 N.W.2d 33, 37 (Iowa 1983). Such evidence may be direct or circumstantial, *State v. Vesey*, 241 N.W.2d 888, 890 (Iowa 1976), and need not be strong or confirm each material fact of the accomplice's testimony, *Hutchison*, 341 N.W.2d at 37. While corroborative evidence must tend to connect defendant to the crime and thus must be inculpatory, it need not be entirely inconsistent with innocence. *Vesey*, 241 N.W.2d at 890–91. Finally, in a joint trial such as this one, the accomplice's testimony must be corroborated as to each defendant. *State v. Dickerson*, 313 N.W.2d 526, 530 (Iowa 1981).

Montgomery's testimony is corroborated in a number of respects. With respect to the January 10 dry run, Ronald Mannion testified he saw a van similar to the one described by Montgomery at approximately the same time and in the same alley. Significantly, Mannion at trial not only identified the van, he also positively identified Brown as one of the three passengers in the van.

Another material aspect of Montgomery's testimony described Brown as wearing a ski mask and an Army jacket and carrying a shotgun as he left the van immediately before the murder. Numerous witnesses testified the murderer was wearing a ski mask and an Army jacket and carrying a shotgun. The shotgun identified at trial as the murder weapon was the same shotgun Montgomery testified Brown was carrying. The jacket identified by Montgomery as the one worn by Brown also was identified by several witnesses as the jacket worn by the murderer.

A third material aspect of Montgomery's testimony concerned his taking Brown to Des Moines almost immediately after the murder. This testimony obviously was inculpatory in that it suggested flight, and

was corroborated by the admission of a bus ticket used by Brown to travel from Des Moines to his home in Arizona. Montgomery's testimony was also corroborated by evidence suggesting Brown made a telephone call on the night of January 10 from Des Moines to his telephone in Arizona.

The total evidence presented against Brown was sufficient to support a jury verdict finding him guilty beyond a reasonable doubt. In fact, we conclude Montgomery's testimony was sufficiently corroborated to itself support Brown's conviction.

III. Brown's next claim of error concerns trial court's refusal to sever his trial from Hollins'. The Iowa Rules of Criminal Procedure provide:

When an indictment or information jointly charges two or more defendants, those defendants may be tried jointly if in the discretion of the court a joint trial will not result in prejudice to one or more of the parties. Otherwise, defendants shall be tried separately. When jointly tried, defendants shall be adjudged separately on each count.

Iowa R.Crim.P. 6(4)(b). Under this rule, defendant may be jointly tried, "if in the discretion of the court a joint trial will not result in prejudice." *Id.*

Trial court's refusal, in the exercise of its discretion, to grant a severance will be reversed on appeal "only if the defendant demonstrates an abuse of discretion." *State v. Belieu*, 288 N.W.2d 895, 900 (Iowa 1980); *see also State v. Sauls*, 356 N.W.2d 516, 519 (Iowa 1984); *State v. Snodgrass*, 346 N.W.2d 472, 475 (Iowa 1984); *State v. Streets*, 330 N.W.2d 3, 4 (Iowa 1983). Trial court will not be found to have abused its discretion unless the challenging defendant demonstrates a joint trial prejudiced his or her right to a fair trial. *Snodgrass*, 346 N.W.2d at 475; *State v. Ware*, 338 N.W.2d 707, 713 (Iowa 1983); *Streets*, 330 N.W.2d at 4; *Belieu*, 288 N.W.2d at 900.

Brown asserts several sources of prejudice denied him a fair trial. He first argues his defense to the murder charge was so antagonistic and conflicting to Hollins'

defense that severance was mandated. We disagree.

▉ Under Iowa law, to prevail on this ground, defendants facing joint trial must show more than "the mere presence of conflict, antagonism, or hostility." *Snodgrass,* 346 N.W.2d at 475; *see also Streets,* 330 N.W.2d at 4. Defendants must also show more than the attempt (even the successful attempt) by one defendant to exculpate himself or herself by incriminating the other defendant. *See Snodgrass,* 346 N.W.2d at 475; *Belieu,* 288 N.W.2d at 900. Rather, when antagonistic defenses are asserted, severance is required only when these defenses "conflict to the point of being irreconcilable and mutually exclusive." *Snodgrass,* 346 N.W.2d at 475.

This level of conflict and antagonism is reached "if the jury, in order to believe the core testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of [a] co-defendant." *Id.* (quoting *United States v. Berkowitz,* 662 F.2d 1127, 1134 (5th Cir. 1981)). In such a situation, "a substantial possibility exists that the jury will unjustifiably infer that this conflict alone demonstrates that both [defendants] are guilty." *Id.* In other words, the defendants' guilt will have been derived not from the evidence presented but rather from the mere presence of irreconcilable and mutually exclusive defenses. With these principles in mind, we turn to the contentions before us.

▉ At trial, Hollins, who was accused of aiding and abetting Brown, denied any involvement in Davidson's murder. In support of this position, he presented numerous witnesses, including himself. Brown, although not taking the stand, also sought to disprove any involvement in the killing and to suggest some third party was the actual killer. These defenses were not antagonistic.

Additionally, neither Brown nor Hollins made any serious attempt to place responsibility for the murder on the other. While Brown at several places in the record attempted to create a suggestion Hollins might have framed him, the record clearly shows these attempts were not representative of Brown's overall trial strategy. Rather, the core of Brown's defense was (1) he was in a bar at the time of the murder and thus could not have shot Davidson; and (2) Davidson was shot by Joe Morrissey or some other third party. Hollins, on the other hand, focused his efforts wholly on establishing his noninvolvement in the murder. He made no attempt to incriminate Brown.

Finally, even assuming the defendants' respective defenses were in some way antagonistic, no evidence exists to suggest the State, in addition to forcing defendants to be tried together, forced defendants effectively to convict each other. This case thus is distinguishable from *State v. Sauls,* in which the presence of dramatically opposed defenses as well as clear evidence the State stood by and allowed each defendant to convict the other convinced us severance was mandated. 356 N.W.2d at 518.

In the last analysis, the defenses offered by Hollins and by Brown gave the jury a variety of options. First, the jury could have concluded neither defendant was involved in the murder. Second, the jury could have believed Hollins or Brown was involved in the murder, while the other was not. Third, the jury could have found Joe Morrissey or some other third party committed the murder. Finally, the jury could have rejected both defenses and found both Brown and Hollins guilty of first-degree murder, as it did.

Nothing in the defenses offered was so irreconcilable and mutually exclusive that in accepting one defendant's defense the jury necessarily would have been forced to reject the other defendant's defense. Thus, trial court did not abuse its discretion in refusing to grant Brown's motion to sever on the ground of irreconcilable defenses.

As a further basis for severance, Brown asserts the trial was of such complexity and length, with so much evidence admitted against only one defendant, that the

jury was unable effectively to compartmentalize the evidence admitted against each defendant. Brown contends this inability to compartmentalize the evidence resulted in prejudicial evidence admitted only against Hollins impermissibly being considered against him and infringing upon his right to a fair trial. We reject this contention.

Although the joint trial was lengthy, the case involved only two defendants, each charged with one count of first-degree murder. Further, the events developed at trial involved a relatively short period of time and highlighted a relatively few number of important and interrelated events.

■ We further note trial court repeatedly cautioned the jury during trial, and again in final instructions, that evidence admitted only with respect to one defendant could be considered only with respect to that defendant. Limiting instructions of this type normally will be sufficient to avoid any potential prejudice. *See Belieu,* 288 N.W.2d at 900. In these circumstances, Brown must do more than merely assert jury confusion. Rather, he must demonstrate that certain evidence admitted only against Hollins was potentially prejudicial to his case and that in fact it was more likely than not the jury was unable to compartmentalize this potentially prejudicial evidence and consider it only against Hollins. *See United States v. Day,* 789 F.2d 1217, 1224 (6th Cir.1986); *United States v. Andrade,* 788 F.2d 521, 530 (8th Cir.1986); *United States v. Wright-Barker,* 784 F.2d 161, 175 (3d Cir.1986); *cf. Belieu,* 288 N.W.2d at 900 (Use of limiting instructions may be sufficient to prevent any prejudicial "spill-over" effect.).

■ Here, Brown cites a number of instances in which testimony was received only as against one defendant. Our examination of this testimony demonstrates that in the vast majority of the situations the testimony admitted as to one defendant made no mention of, was unrelated to, and did not inculpate the other defendant. In the few instances where testimony admitted against one defendant mentioned the other defendant, the reference was either not inculpatory or, to the extent it was, the jury clearly was on notice the evidence was to be considered only with respect to one defendant.

The same conclusion applies to various exhibits admitted against only one defendant. Most of these exhibits are on their face unrelated to the other defendant. Further, as with actual trial testimony, trial court made clear which exhibits were admitted against which defendant. Defendants point to no indication the jury was confused in any way. Trial court commendably compiled and submitted to the jury a list of exhibits specifying those exhibits offered against each defendant, and those offered against both.

We conclude Brown has failed to show jury confusion or failure to compartmentalize. Trial court did not abuse its discretion in refusing to sever Brown's trial on this ground.

■ Finally, Brown argues trial court's refusal to sever denied him the right to testify in his own defense. Brown contends he could not testify out of fear of retaliation. We find no merit in this contention.

Trial court did nothing to prevent Brown from testifying. He was afforded every opportunity to testify; no more was required. *See Crane v. Kentucky,* —— U.S. ——, ——, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636, 645 (1986); *State v. Whiteside,* 272 N.W.2d 468, 470 (Iowa 1978).

Further, Brown's asserted fears of future retaliation were unsupported. An unsupported assertion of retaliation without more simply will not establish a denial of the right to testify. *See United States v. Panza,* 612 F.2d 432, 437 (9th Cir.1979), *cert. denied,* 447 U.S. 925, 100 S.Ct. 3019, 65 L.Ed.2d 1118 (1980). Finally, the record is barren of any suggestion Brown had any present fears of testifying. *See Schertz v. State,* 380 N.W.2d 404, 412–13 (Iowa 1985).

We hold trial court committed no error in refusing to sever Brown's trial.

IV. Brown contends trial court erred in allowing Debra Jackson, Onzo Moss, and William Hodges to testify. Brown relies on Iowa Rule of Criminal Procedure 13, which in relevant part provides:

> When a witness subpoenaed by the prosecuting attorney pursuant to rule 5 of the rules of criminal procedure is summoned by the prosecuting attorney *after complaint, indictment or information,* the defendant shall have a right to be present and have the opportunity to cross-examine any witnesses whose appearance before the prosecuting attorney is required by this rule.

Iowa R.Crim.P. 13(1) (emphasis added). Rule 13(1) was violated by the State when, after defendants had been charged, it subpoenaed and took the sworn statements of Hodges, Moss, and Jackson without defendants or their attorneys being present.

When Brown learned of the violation, he filed a motion seeking to suppress the testimony of these witnesses. Brown asserted suppression was necessary because the coercive nature of the illegal interrogation forever tainted the witnesses' testimony.

After an evidentiary hearing, trial court entered an order denying Brown's motion to suppress.

■■■ In denying this motion, trial court again was guided by Iowa Rule of Criminal Procedure 13, which states:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may upon timely application order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing any evidence not disclosed, or it may enter such other order as it deems just under the circumstances.

Iowa R.Crim.P. 13(6)(c). Remedies under rule 13(6)(c) are discretionary in nature and will be reversed only if trial court abuses its discretion. *State v. Leto,* 305 N.W.2d 482, 489 (Iowa 1981).

■■■ While exclusion of testimony is a rule 13(6)(c) sanction available to trial court, *see State v. Marchellino,* 304 N.W.2d 252, 255–56 (Iowa 1981), it is by no means the only option available, *see State v. Froning,* 328 N.W.2d 333, 337–38 (Iowa 1982). Rather, in exercising its discretion, trial court should consider: (1) the circumstances surrounding the violation; (2) the prejudice, if any, resulting from the violation; (3) the feasibility of curing any prejudice; and (4) any other relevant consideration. *State v. Thompkins,* 318 N.W.2d 194, 198 (Iowa 1982).

■■■ Here, the record supports trial court's finding the rule 13(1) violations occurred shortly after charges were filed and were the result of oversight. The court enjoined the State from further violations of rule 13(1) and ordered the State to make available to defendants all statements and depositions improperly taken. The State complied. Defendants then deposed these witnesses at length and had the opportunity to cross-examine them thoroughly at trial. Trial court specifically instructed the jury concerning the State's violation of Iowa Rule of Criminal Procedure 13(1).

We conclude trial court acted appropriately and did not abuse its discretion when it refused to suppress the testimony of Hodges, Jackson, and Moss.

V. Brown also challenges trial court's refusal to grant a mistrial for certain actions taken by the prosecutor during the testimony of Waterloo police officer John Daws. Daws was one of the officers involved in the investigation of Davidson's murder. A primary purpose of his investigation was to determine whether Morrissey was involved in or had some information about Davidson's murder.

In developing Officer Daws' testimony at trial, the State asked him why the police had attempted to speak to Morrissey following a search of his residence. Brown objected, asserting the State's question called for Daws to speculate. At an ensuing side bar conference, trial court instructed counsel that Daws would be permitted

to testify to the contents of any discussion with Morrissey but could not testify with respect to whether any evidence obtained during these discussions was viewed by the department as inculpatory or exculpatory.

Following this discussion, the State asked Daws, "Why did you want to talk further to Mr. Morrissey?" Daws replied, "Throughout our investigation we'd learned that Mr. Morrissey was associated with the defendants. We believed that he was not directly involved [in the murder] although he had possible knowledge [of it]." At this point, Brown objected and moved for a mistrial.

Trial court, after a discussion outside the jury's presence, agreed that the response violated its previous order, but rejected Brown's motion.

When the jury returned, the court ordered Daws' response stricken from the record and directed the jury "to totally disregard [the response] and to wipe it from your memories." Trial court's later instructions further informed the jury, "You must not consider for any purpose any offer of evidence that was rejected or any evidence that was stricken out by the court; such matter is to be treated as though you never heard it."

■■■ Trial court has broad discretion in ruling on motions for mistrial. *State v. Washington*, 308 N.W.2d 422, 424 (Iowa 1981); *State v. Trudo*, 253 N.W.2d 101, 106 (Iowa), *cert. denied*, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 189 (1977). Generally, trial court's quick action in striking the improper response and cautioning the jury to disregard it, coupled, when necessary, with some type of general cautionary instruction, will prevent any prejudice. A defendant who asserts these actions were insufficient bears the heavy burden of demonstrating a clear abuse of discretion on the part of trial court. *State v. Staker*, 220 N.W.2d 613, 617 (Iowa 1974).

Brown has made no showing trial court's actions failed to remove any potential prejudice he might otherwise have suffered

had the offending response not been stricken. We find no error in this regard.

■■■ VI. As part of his defense, Brown presented Chester Walton's testimony. Walton testified he saw Brown in a bar shortly before and shortly after the time of the murder. Direct examination by Brown also established Walton was a convicted drug dealer who noticed Brown out of a concern he might be an undercover narcotics officer.

On cross-examination, the State sought to determine why Walton could not specifically account for Brown's presence in the bar at the time of the murder. Walton indicated he had left the bar during that period. When asked why he had left, Walton asserted his fifth amendment right against self-incrimination. Brown's counsel again moved for mistrial, arguing the State knew Walton would claim his fifth amendment right and yet intentionally sought to elicit that claim to discredit Walton's testimony and prejudice Brown's defense. Trial court rejected Brown's contention both during trial and again in Brown's motion for new trial. We find no error.

Under Iowa law, "it is improper for [the State] to require a witness to claim his privilege against self-incrimination in the presence of the jury when ... the prosecutor knows or has reason to anticipate the witness will assert it." *State v. Allen*, 224 N.W.2d 237, 240 (Iowa 1974). Assuming the State knew Walton would assert his fifth amendment right, however, a denial of Brown's motion for mistrial would not necessarily constitute reversible error.

Rather, for reversible error to exist it must appear directly or inferentially

(1) that the witness appears to have been so closely implicated in the defendant's alleged criminal activities that the invocation by the witness of a claim of privilege when asked a relevant question tending to establish the offense charged will create an inference of the witness' complicity, which will, in turn, prejudice the defendant in the eyes of a jury; (2) that the prosecutor knew in advance or had reason to anticipate that the witness

would claim his privilege, or had no reasonable basis for expecting him to waive it, and, therefore, called him in bad faith and for an improper purpose; (3) that the witness had a right to invoke his privilege; (4) that defense counsel made timely objection and took exception to the prosecutor's misconduct; and (5) that the trial court refused or failed to cure the error by an appropriate instruction or admonition to the jury.

*Id.* at 241 (quoting *State v. Whitfield,* 212 N.W.2d 402, 408 (Iowa 1973)).

Here, we agree with trial court's determination the first factor was not present. Walton was neither Brown's accomplice nor in any way implicated in the murder charge. Walton's assertion of his constitutional right was relevant only to events entirely unrelated to Brown's trial. The fifth factor necessary to find reversible error also was absent. Trial court offered to give a cautionary instruction if Brown so requested. He did not request such an instruction.

We conclude trial court did not commit reversible error when it rejected Brown's motion for mistrial based upon the State's improper elicitation of Walton's claim of privilege.

■■■ VII. Brown claims trial court erroneously overruled his objections to five autopsy photographs. The test for admitting photographs is two-fold: " '(1) the evidence must be relevant and (2) if the evidence is relevant the trial court must determine whether the probative value of the exhibits outweighs the prejudice which would be caused by their admission into evidence.' " *State v. Oliver,* 341 N.W.2d 25, 33 (Iowa 1983) (quoting *State v. Chadwick,* 328 N.W.2d 913, 916–17 (Iowa 1983)). Trial court committed no error.

At trial, Dr. Donald Hayes, the pathologist who conducted the autopsy on Davidson's body, testified extensively with respect to the nature, extent, and severity of Davidson's wounds. We agree with trial court that the autopsy photographs were relevant to illustrate and explain Hayes' testimony. *See State v. Allen,* 348 N.W.2d 243, 247 (Iowa 1984). Brown makes no claim Hayes' testimony was not itself relevant.

We also conclude trial court committed no error when it found Brown was not prejudiced by the admission of these pictures. Davidson's death had been graphically described. Further, a gruesome photograph depicting Davidson's body immediately following the murder was admitted and that admission has not been appealed. The autopsy photographs simply embellished the graphic picture that already had been drawn, both verbally and visually, for the jury. *See State v. Munz,* 355 N.W.2d 576, 580 (Iowa 1984).

That the autopsy photographs were themselves somewhat gruesome does not render them inadmissible. *State v. Coburn,* 315 N.W.2d 742, 746 (Iowa 1982). Murder is often a gruesome affair giving rise to equally gruesome evidence. That alone is not sufficient reason to exclude that evidence. *State v. Nowlin,* 244 N.W.2d 596, 600 (Iowa 1975).

VIII. Finally, Brown asserts our refusal to allow him to file a brief more than sixty-five pages in length denied him due process and equal protection in violation of the United States Constitution. He also asserts the page limitation had the effect of denying him effective assistance of appellate counsel. We disagree.

■■■ Focusing on due process, defendants are constitutionally entitled to a meaningful opportunity to be heard. A sixty-five page brief coupled with an opportunity to file a reply brief and present oral argument provided Brown such an opportunity. No more was constitutionally required.

■■■ Brown's equal protection argument also is without merit. The sixty-five pages allowed Brown was more than that normally allowed. Iowa R.App.P. 14(h). He can hardly be heard to complain because he was allowed a lengthier brief than normal. Brown has made no attempt to suggest this court has in the past treated defendants situated similarly in a more fa-

vorable manner. Regardless, given the infinite variety and complexity of cases, whether leave will be granted to file oversize briefs necessarily must be made on a case-by-case basis in light of the circumstances presented.

■ Turning finally to Brown's claim of ineffective assistance of counsel, we find no indication the sixty-five page limit crippled counsel's efforts. In fact, the record and briefs clearly demonstrate appellate counsel has done an excellent job in identifying and arguing those issues that held any hope of reversal.

After considering each issue raised in this appeal, we conclude district court committed no reversible error. We therefore affirm Brown's conviction.

AFFIRMED.