# IN THE COURT OF APPEALS OF IOWA

No. 24-0770
Filed September 17, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**TYLER LEE MILLS,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Cass County, Richard H. Davidson,
Judge.

        A defendant appeals his conviction for third-offense stalking, challenging
the denial of a mistrial motion, the sufficiency of the evidence, and a sentencing
enhancement. **CONVICTION AFFIRMED, SENTENCE VACATED, AND
REMANDED FOR FURTHER PROCEEDINGS**

        Jesse A. Macro, Jr. of Macro Law, LLP, Des Moines, for appellant.

        Brenna Bird, Attorney General, and Joseph D. Ferrentino, Assistant
Attorney General, for appellee.

        Considered without oral argument by Greer, P.J., Badding, J., and
Potterfield, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206
(2025).

**BADDING, Judge.**

Over an eight-month period in 2023, Tyler Mills sent his ex-girlfriend, R.T., hundreds of messages on a social media app under forty-two aliases. Some of the messages threatened to hurt or kill her. At the same time, Mills was following R.T. everywhere—to work, the store, outings with her friends, her home, and the homes of her family and friends. She described him as "relentless. He does not leave me alone."

A jury convicted Mills of stalking, and he stipulated to two prior convictions for the same offense, enhancing the crime to a class "C" felony. *See* Iowa Code § 708.11(3)(a)(5) (2023). On appeal from that conviction, Mills challenges: (1) the district court's denial of his motion for a mistrial; (2) the sufficiency of the evidence supporting his conviction; and (3) his sentencing enhancement.

## I. Mistrial

Beginning in May 2023, after weeks of nonstop messages from Mills, R.T. recorded videos of Mills driving past her work, home, and other locations. On some of these videos, she narrated where she was and what Mills was doing. In one, she said that Mills was "gonna go back to prison." The district court granted Mills's motion in limine to exclude that comment.

The State redacted the video to comply with the court's ruling. But at trial, the prosecutor mistakenly played the unredacted video with the prison comment. Defense counsel asked for a sidebar, following which the court admonished the jury: "Ladies and gentlemen, during that last video in the last phrase there was a statement made where you'll go back to prison. That phrase, you need to disregard as if it was never stated. And the objection that was made by counsel is

sustained. Ask your next question." Defense counsel later moved for a mistrial, which the court denied.

Mills claims the district court should have granted the motion because "no limiting instruction could cure the prejudicial effect of a juror hearing Mr. Mills had been to prison before." We review this claim for an abuse of discretion. *State v. Brown*, 5 N.W.3d 611, 614–15 (Iowa 2024). "In doing so, we give district courts 'considerable discretion in ruling upon motions for mistrial, since they are present throughout the trial and are in a better position than the reviewing court to gauge the effect of the matter in question on the jury.'" *Id.* (citation omitted).

"Generally, [a] trial court's quick action in striking the improper response and cautioning the jury to disregard it, coupled, when necessary, with some type of general cautionary instruction, will prevent any prejudice." *State v. Brown*, 397 N.W.2d 689, 699 (Iowa 1986). The court took quick action here, immediately telling the jury to disregard the offending statement. *See State v. Plain*, 898 N.W.2d 801, 815 (Iowa 2017) (considering the court's promptness in addressing the inadmissible evidence). Its final instructions also told the jury that "[t]estimony I told you to disregard" was not evidence. "A defendant who asserts these actions were insufficient bears the heavy burden of demonstrating a clear abuse" of the court's discretion. *Brown*, 397 N.W.2d at 699. Mills has not met that burden.

The State played more than eighty videos for the jury during the three-day trial. The reference to Mills going back to prison in one of those videos was "brief and inadvertent." *Plain*, 898 N.W.2d at 814–15 (affirming the court's denial of mistrial where the jury heard a 911 call stating that the defendant "was not afraid to 'go back to prison'" because the inadmissible evidence was not extensive). The

jury already knew that Mills had been convicted of domestic abuse assault causing bodily injury and violating a no-contact order with R.T. And, as will be detailed below, the State's evidence was strong, so the prejudicial effect of the prison comment was minimal. *Id.* (noting that the "stronger the State's evidence of [the defendant's] guilt is, the less prejudicial the effect of the challenged testimony"). For these reasons, the district court did not abuse its discretion in denying Mills's mistrial motion.

## II. Sufficiency of the Evidence

The jury was instructed that to find Mills guilty of stalking, the State had to prove:

> 1. Between the 1st day of April, 2023, and the 9th day of December, 2023, the Defendant purposefully engaged in a course of conduct directed at [R.T.] that would cause a reasonable person to fear bodily injury to, or the death of [R.T.]
> 2. The Defendant knew or should have known that [R.T.] would be placed in reasonable fear of bodily injury or death to [R.T.] or a member of her immediate family.

Mills concedes the course of conduct element, challenging only the sufficiency of the evidence supporting whether his conduct would cause a reasonable person to fear bodily injury or death and whether he knew or should have known that R.T. would be placed in such fear. We review that challenge "for the correction of errors at law, viewing the evidence in the light most favorable to the State." *Brown*, 5 N.W.3d at 615 (citation omitted). "This includes making legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence. There is sufficient evidence to support the jury's verdict when the evidence would convince a rational fact finder the defendant is guilty beyond a reasonable doubt." *Id.* at 615–16 (cleaned up).

R.T. testified that she started dating Mills in August 2018. Their relationship ended less than a year later—in June 2019—when Mills pushed her down a flight of stairs and broke her ribs. Mills pled guilty to domestic abuse assault causing bodily injury, and a no-contact order was entered. The couple reunited in May 2022, while that order was still in place. They were together, off and on, over the next few months. By October, R.T. testified that he "was hounding [her] constantly about dropping" the order. So she filed a motion with the court, stating: "I do not feel unsafe." But because she did not appear at the hearing on the motion, the order remained in place. In February 2023, Mills and R.T. had their last sexual encounter after Mills broke into her car and was waiting for her in the back seat when she got off work. After that incident, R.T. told Mills that she "wanted this to be over." Mills refused to part ways.

R.T. testified that Mills tried to contact her every day after their relationship ended, mostly through Snapchat. He used forty-two accounts under male and female aliases. R.T. took screenshots and pictures of the messages that he tried to send her, many of which she did not open. The ones that she did open were often threatening. As one example among many, Mills sent this series of messages to R.T. in July:

> Where are you fucking at dumb whore!! Where are you fucking at@!!! You're the one fucking hiding shit NOT ME!!!!
> Who are you fucking with whore
> . . . .
> Where was you at you dumb whore!!!! I know where you were so you going to lie to me again????? I will hurt you keep fucking around!!!!
> . . . .
> Why are you fucking doing this fucking bullshit to me . . . ??????!!!!!!!!!! Who are you fucking talking to????? If I find out you are I will fucking hurt you I'm done with the fucking bullshit

and I'm tired of you fucking blaming me when I'm not fucking doing anything and not talking to anyone!!!!!!  What are you fucking hiding huh???

Other messages threatened, "I will break your phone your fucking making me mad"; asked, "Why was the cops at your house yesterday??"; demanded that she "come and fucking talk to me now"; and said, "if you call the cops ever again NO one will see you."  A final rant in December warned:

> I'm not going to STOP til this is dropped and you stop doing your bullshit and fucking other guys!!!!!  And if it keeps happening it won't be pretty!
> . . . .
> [I]f the paperwork isn't done by the 27th the cops or the no contact order won't help you!
> . . . .
> You better fucking hope you're not ta[l]king to the county attorney about me or sending them nothing!!!!  Because you're kids . . . will grow up without you around!!!!
> . . . .
> You better not be giving videos or talking to the fucking cops . . . !!!  If you are you will be gone for a lifetime!  And I will only be gone for 8 months. . . .

When R.T. did respond to these messages—which was not often—she told Mills to leave her alone.  But Mills continued to pursue her.

On top of his incessant messaging, Mills constantly drove by R.T.'s home, work, and other locations she frequented.  Mills followed her so often that she made sure to drive on busy streets past businesses with cameras and had co-workers escort her home.  Police eventually obtained a search warrant to install a tracker on Mills's truck, which showed that he would "target roads that . . . were adjacent to [R.T.'s] home," creating a sort of "perimeter box around [her] house," as well as R.T.'s work and her daughter's apartment.  Mills drove these routes for hours—stopping every so often to park and watch her home or work.

Mills's behavior escalated beyond messages and drive-bys several times. He broke into R.T.'s house twice when she was there alone. R.T. testified that, during Mills's last beak-in, he threatened to "slit her [daughter's] throat" if she called the police. He also showed up uninvited to a bonfire R.T. attended, where he "pulled a switch blade out" on her friends' dog and threatened to bash their car windshield in. And when R.T. tried to go to the beach with her friends, Mills drove into the parking lot where they were waiting for her, screaming, "I know where you live, I can kill you, I will." On a second trip to the beach, Mills followed R.T. home and tried to run her off the road.

These direct threats of harm go beyond the proof required by our stalking statute. *See, e.g.*, *State v. Evans*, 671 N.W.2d 720, 726 (Iowa 2003) (finding sufficient evidence to support a stalking conviction even though the defendant never made any threats based on his persistent contact with the victim and unexpected arrivals at her house). Nevertheless, Mills argues that R.T.'s actions show that she did not fear him. He points to the rekindling of their relationship in the summer of 2022, R.T.'s request to cancel the no-contact order that October, and their sexual encounter in February 2023. He also notes that R.T. "would walk her granddaughter on the same street" the State claimed that he "was stalking her on."

Mills made these same arguments at trial. But R.T. repeatedly testified that she was scared of Mills. And one of her friends testified that she saw how Mills's actions affected R.T., describing her as "being scared, crying, shaking, anxiety, just unreal." When defense counsel cross-examined R.T. about her attempt to cancel the no-contact order, she explained that she filled out the motion while Mills

was on the phone threatening her. And she did not follow through with it, leaving the no-contact order in place. *See State v. Helmers*, 753 N.W.2d 565, 568 (Iowa 2008) (stating a no-contact order is "a key piece of evidence" showing that a defendant was aware his course of conduct could place the victim in reasonable fear of bodily injury); *State v. Neuzil*, 589 N.W.2d 708, 712 (Iowa 1999) ("A stalker should know that his actions are unappreciated if he was served with a court order . . . ." (citation omitted)). R.T. similarly testified that she only had sex with Mills in February 2023 because she was scared when she found him in her car and knew that would make him leave without hurting her. As for walking her granddaughter home, R.T. testified, "I don't feel like I should have to rearrange my entire life because of him. I've done it for so long that I just want some normalcy in my life, and it was a beautiful day."

The jury was free to credit R.T.'s testimony over Mills's spin on the evidence. *See State v. Brimmer*, 983 N.W.2d 247, 256 (Iowa 2022) (stating it is "for the jury to decide which evidence to accept or reject"). Despite Mills's argument that R.T.'s "outward conduct" showed she was not threatened by his admittedly "obsessive behavior," substantial evidence shows otherwise, especially considering the history between the two. *See State v. Taylor*, 689 N.W.2d 116, 128 n.6 (Iowa 2004) ("The relationship between the defendant and the victim, especially when marked by domestic violence, sets the stage for their later interaction."); *State v. Bonert*, No. 11-1677, 2012 WL 4550851, at *5 (Iowa Ct. App. Oct. 3, 2012) (finding a defendant's drive-bys past the victim's residence could cause a reasonable person fear because of the history of domestic violence between the parties); *State v. Moyle*, No. 23-1235, 2025 WL 2057646, at *6–7 (Iowa Ct. App.

July 23, 2025) (finding a defendant's previous convictions supported an inference that he knew or should have known his drive-bys were threatening). "It is not our place to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence," which is exactly what Mills asks us to do on appeal. *Brimmer*, 983 N.W.2d at 256 (cleaned up).

Viewing the evidence in the light most favorable to the State, we find substantial evidence on the challenged elements of Mills's stalking conviction.

## III. Sentencing Enhancement

Mills's final claim is that the district court failed to conduct an adequate colloquy on his stipulation that he had two prior stalking convictions, which enhanced his offense to a class "C" felony. *See* Iowa Code § 708.11(3)(a)(5).

When an offender affirms prior convictions in a stipulation to a sentencing enhancement, the court "must ensure that the admission is 'voluntary and intelligent,' and that the defendant understands 'the ramifications of an habitual offender adjudication.'" *State v. Harrington*, 893 N.W.2d 36, 45 (Iowa 2017) (citations omitted); *see also State v. Smith*, 924 N.W.2d 846, 852 (Iowa 2019) (noting the *Harrington* colloquy requirements have been extended "to other sentence-enhancement, prior-offenses stipulations"). To meet this standard, the court must hold a colloquy informing the defendant—among other important things—that the prior felony convictions "are only valid if obtained when the [defendant] was represented by counsel or knowingly and voluntarily waived the right to counsel." *Harrington*, 893 N.W.2d at 45; *accord* Iowa R. Crim. P. 2.19(8)(a)(2).

Mills's argument is twofold. First, he claims the court did not inform him the prior convictions were valid only if he was either represented by or waived counsel. Second, given the defective colloquy, Mills asserts the court failed to confirm that his right to counsel was, in fact, observed. Because of these failures, Mills argues the "third offense enhancement must be vacated by the court and this matter remanded back to the trial court for further proceedings." We agree with the parties that we can reach this issue even though Mills did not file a motion in arrest of judgment because the court did not advise him about that right. *See Smith*, 924 N.W.2d at 851.

The State acknowledges that neither Mills's written stipulation to the prior offenses nor the court's colloquy with Mills on the record addressed whether Mills had counsel or validly waived counsel on the prior convictions. But it argues that Mills waived the issue because he did not raise it below. It is true that "the state is not required to prove the prior convictions were entered with counsel if the offender does not first raise the claim." *State v. Coleman*, 907 N.W.2d 124, 147–48 (Iowa 2018) (quoting *Harrington*, 893 N.W.2d at 46). The burden was on Mills to challenge the prior convictions. *Id.* at 148. So we agree that, under normal circumstances, it would be too late for him to assert they were unconstitutionally obtained. *See id.* (finding a defendant "waived his claim that the State did not establish" that his right to counsel was satisfied where he failed to object at the time of the colloquy).

However, the State's waiver defense goes only to Mills's second argument. It does not address the incompleteness of the court's colloquy. The purpose of the *Harrington* colloquy is to ensure the defendant's stipulation "is made voluntarily

and intelligently and has a factual basis." *Harrington*, 893 N.W.2d at 45. Unless the district court informs the defendant that predicate convictions must have been obtained in compliance with the right to counsel, we cannot deem a stipulation voluntary and intelligent. *Coleman*, 907 N.W.2d at 148 (finding the record insufficient to "conclude Coleman knowingly and voluntarily stipulated to his prior convictions since he was not informed of his constitutional rights and the consequences of his stipulation"); *Smith*, 924 N.W.2d at 852–53 (same); *Harrington*, 893 N.W.2d at 47 (same). The State's only argument on this point is that the district court "substantially complied" with the *Harrington* requirements because it "neglected only this one question" in the colloquy. But the State cites no binding authority for its "one question" exception, and we decline to adopt that standard here.[1] *See State v. Meron*, 675 N.W.2d 537, 542 (Iowa 2004) ("The record must confirm the existence of substantial compliance in listing *each right*." (emphasis added)). Unlike in cases where a defendant was otherwise apprised of the rights omitted from an oral colloquy, *see, e.g.*, *State v. Oldham*, 515 N.W.2d 44, 46–47 (Iowa 1994), we find nothing in the record to confirm that Mills was informed about the counsel requirements for his prior convictions.

---

[1] In support of its substantial compliance argument, the State points to our unpublished decision in *State v. Wade*, which excused a district court's failure to advise a defendant of the mandatory minimum sentence prior to accepting his stipulation to prior convictions. No. 16-0867, 2017 WL 2181450, at *5 (Iowa Ct. App. May 17, 2017). However, the conviction in *Wade* predated *Harrington*, and so we declined to enforce the colloquy requirements at all. *See id*. at *4. While we noted in dicta that the court "substantially complied with [*Harrington*'s] requirements," we emphasized that "the court did not have the benefit of *Harrington* at the time of the colloquy." *Id.* at *5. *Wade*'s reasoning does not apply today.

Because the court's colloquy leaves us unable to conclude that Mills's admission was knowingly and voluntarily made, we affirm Mills's stalking conviction but vacate the sentence. We remand for either a new stipulation colloquy consistent with the requirements of *Harrington* or trial on the prior convictions. *See Smith*, 924 N.W.2d at 853.

**CONVICTION AFFIRMED, SENTENCE VACATED, AND REMANDED FOR FURTHER PROCEEDINGS.**